MERCHANTS EXCHANGE OF ST. LOUIS et al. v.
KNOTT et al., Constituting the Board of Railroad
and Warehouse Commissioners, Appellants.

In Banc, June 6, 1908.

1. **CONSTITUTIONAL LAW: Delegation of Legislative Power:
Fixing Fees.** A law which authorizes the Board of Railroad
and Warehouse Commissioners to fix the fees for inspecting
and weighing grain at such sums as will pay the inspectors
and weighers for their services, is not an unconstitutional dele-
gation of legislative power to fix fees. And the Act of 1907,
when read in connection with section 7658, R. S. 1899, which
was not repealed by the Act of 1907 and which said, "Which
charges shall be regulated in such manner as will, in the judg-
ment of the commissioners, produce sufficient revenue to meet
the necessary expenses of the service of inspection, and no more,"
did not grant an unregulated power to the commissioners to
fix fees.

2. ———: ———: *Roving Commission to Enforce.* The Grain-
Weighing and Grain-Inspection Act of 1907, Laws 1907, p. 285,
declaring that "the Board of Railroad and Warehouse Commis-
sioners are hereby authorized to establish State inspection and
weighing of grain at such places or in such territory within the
State as in their opinion may be necessary," and that "all build-
ings, elevators or warehouses located in any territory wher-
ever State grain inspection and weighing may be established
by the State Board of Railroad and Warehouse Commis-
sioners . . . . . are hereby declared public warehouses,"
etc., and that "all grain arriving in any territory where State
grain inspection may be established by this article . . . .
shall be inspected and graded by a duly authorized State In-
spector," gives to the commissioners the vital power to ca-
priciously say, as their opinion serves, to what places, in what
territory and at what times the statute shall apply, or whether
or not it shall be in force at any time in any place, and is void
of any certain intendment of the legislative mind, beyond the
mere grant of power, and the power granted in its essence par-
takes of simple despotism. It does not in any wise define or
classify warehouses or elevators or the territory upon which
it is to operate; it does not confine itself to warehouses of a
certain given capacity or devoted by their owners to a defined,
quasi-public, commercial use; it does not confine itself to cities
of a given size or class, nor to places, territories or markets

having elevators or warehouses defined in the statute by their use, character, or capacity; it gives the commissioners the capricious power to say to what elevators it shall apply, and when and when not. It is, therefore, void.

3. ———: ———: ———: **Legislative in Character.** Such act is not legislative in character. It is not a rule of conduct prescribed by the supreme power, the law-making body, which is the General Assembly. The power to bind and loose, to inaugurate or suspend the operation of a law, to say when and where it is law, is of necessity an inherent and integral part of the law-making power, not to be delegated to any commission, to be used when in its "opinion" it "may be" considered "necessary."

4. ———: ———: ———: **Power of Legislature.** The General Assembly cannot delegate legislative power. The law-making power must remain where the Constitution places it.

5. ———: ———: **Police Power: Exercise.** The question to be considered in passing on the constitutionality of the Grain-Weighing and Grain-Inspection Act of 1907 is one of delegation of police power, and not the exercise of it by the General Assembly. Therefore, the case of State ex inf. v. Goffee, 192 Mo. 689, holding that such a statute is within the constitutional authority of the General Assembly, exercising the State's police power, is not in point. The doctrine of that case is affirmed, but there is a wide difference between the delegation of police power to a commission, and its proper exercise by the Legislature.

6. ———: ———: ———: ———: **Rights.** No man holds his property or rights subject to the unregulated discretion of another.

7. ———: **Equitable Relief: Multiplicity of Suits.** A petition for injunctive relief against an unconstitutional act, which alleges that defendants are about to annoy plaintiffs and their employees with a multitude of vexatious suits for failure to observe such act, without pleading the character of the threatened suits, whether criminal or civil, does not state a cause of action for equitable relief on the ground of multiplicity of suits.

8. ———: ———: **Irreparable Injury.** But a petition charging that irreparable injury to plaintiffs' business would result from the enforcement of an unconstitutional law, states a ground for equitable relief. And a petition which shows that plaintiffs' business of grain-weighing and certification is a valuable asset and property in grain dealing, that it has been built up and nurtured through many years in connection with their business of dealing in grain, and that it is about to be struck down and

ruined and their grain markets ruined, in ways pointed out, by the enforcement of an unconstitutional law authorizing weighing by State weigh-masters, is such a petition.

9. ———: ———: ———: **Demurrer.** An unconstitutional law is the same as no law at all; and, on demurrer to a petition sufficiently charging that irreparable injury will result to plaintiffs' business by the enforcement of such a law, it will be assumed that the allegations of irreparable injury in the ways specified in the petition, are true.

10. ———: ———: **Against the State.** The Board of Railroad and Warehouse Commissioners are plain ministerial officers, and not the State of Missouri; and, therefore, when it is charged that they are about to do irreparable injury to the business of citizens of the State, equitable relief will not be denied on the theory that the State cannot be sued.

Appeal from St. Louis City Circuit Court.—*Hon.* *Daniel G. Taylor,* Judge.

AFFIRMED.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for appellants.

(1) State inspection and weighing of grain is a valid exercise of the police power of the State, and the court erred in holding the Act of 1907 unconstitutional. State ex inf. v. Goffee, 192 Mo. 670; Munn v. Illinois, 94 U. S. 113; Munn v. People, 69 Ill. 80; Cooley's Const. Lim., 870; Budd v. New York, 143 U. S. 517; St. Louis v. McCann, 157 Mo. 301; Morrison v. Morey, 146 Mo. 543; Land & Stock Co. v. Miller, 170 Mo. 240; State v. Tie & Timber Co., 181 Mo. 536; City of St. Charles v. Elsner, 165 Mo. 671; State ex rel. v. Mercantile Co., 184 Mo. 160. (2) Inspection of weight and quantity is as valid an exercise of the police power as the inspection of quality. State ex inf. v. Goffee, 192 Mo. 670; City of St. Charles v. Elsner, 155 Mo. 671; Coal Co. v. St. Louis, 130 Mo. 323; 22 Cyc. 1365; State v. Pittsburg, etc., Coal Co., 41 La. Ann. 465; Pittsburg, etc., Coal Co. v. La.,

156 U. S. 590; Freund on Police Powers, sec. 274. (3) Section 7623 of the Act of 1907, authorizing the Board of Railroad and Warehouse Commissioners to establish State inspection of grain at such places or in such territory as in their opinion may be necessary, is a valid exercise of legislative power, and the court erred in holding the Act of 1907 unconstitutional as an unlawful delegation of legislative power. Land & Stock Co. v. Miller, 170 Mo. 240; State v. Thompson, 160 Mo. 330; 6 Am. and Eng. Ency. Law, 1032; 8 Cyc. 833. (4) The power conferred upon the Board of Railroad and Warehouse Commissioners by the Act of 1907, to fix fees and make rules and regulations for the inspection and weighing of grain, is a valid exercise of legislative power. State ex inf. v. Goffee, 192 Mo. 670; Coal Co. v. St. Louis, 130 Mo. 323; City of St. Charles v. Elsner, 155 Mo. 671; Munn v. Illinois, 94 U. S. 113; 22 Cyc. 1368. (5) The State inspection and weighing of grain provided for by the Act of 1907, is not an unlawful interference with interstate commerce. Munn v. Illinois, 94 U. S. 113; Pittsburg, etc., Coal Co. v. La., 155 U. S. 590; Turner v. Maryland, 107 U. S. 38; 22 Cyc. 1365. (6) The Act of 1907 is not violative of section 1 of the Fourteenth Amendment to the Federal Constitution. Brannon on the Fourteenth Amendment, 222; Munn v. Illinois, 94 U. S. 113.

*Robert F. Walker, Judson & Green, Frank Hagerman* and *Kimbrough Stone* for respondents.

(1) State inspection and weighing at other places than public elevators under the Act of 1907, is an unauthorized exercise of the police power and therefore void. State v. Layton, 160 Mo. 498; State ex rel. v. Associated Press, 159 Mo. 437; State ex rel. v. Ashbrook, 154 Mo. 385; Wilkinson v. Leland, 2 Pet. 657; Cooley, Con. Lim. (6 Ed.), 484, 704, 710, 736; State

ex rel. v. Mer. Co., 184 Mo. 184; Slaughter House Cases, 111 U. S. 757; State v. Mo. Tie & Timber Co., 181 Mo. 558. (2) The act in question is a delegation of legislative power to the Board of Railroad and Warehouse Commissioners and is consequently unconstitutional and void. Secs. 7623, 7677, pp. 286, 297, Laws 1907; art. 3, and sec. 1, art. 4, Con. Mo.; State v. Field, 17 Mo. 529; Rice v. Foster, 4 Harr. (Del.) 479; Cooley, Con. Lim., 117-123; State ex rel. v. Ashbrook, 154 Mo. 389; St. Louis v. Heitzberg Packing Co., 141 Mo. 388; Yick Wo v. Hopkins, 118 U. S. 356; In re Quong Woo, 13 Fed. 229; In re Woo Lee, 26 Fed. 471. (3) The fees authorized by the act to be imposed by the board on grain dealers, are not limited to the actual cost of the service and are in effect taxes, and as such void in not being assessed and levied as required by the State Constitution. Secs. 1, 3 and 4, art. 10, Con. Mo. The power of taxation is legislative and cannot be delegated to ministerial agencies. State v. Shortridge, 56 Mo. 130; Matthews v. City, 68 Mo. 119; Lammert v. Lidwell, 62 Mo. 192; Railroad v. St. Board, 64 Mo. 307. The levying of a tax being the exercise of a high governmental power, there must be distinct authority of law for every exercise of that power. St. Louis v. Apperson, 97 Mo. 306. To constitute a fee, instead of a tax, the right of the State, under its police power, to impose same must exist, and this can only exist when the business for the transaction of which the fee is exacted is charged with a public use or is an expense or a burden or is injurious to the public. Any other fee imposed, whether a license is granted thereunder or not, is simply a tax collected for revenue. St. Louis v. Spiegel, 113 Mo. 88, 75 Mo. 145. Such taxes must be imposed under the constitutional limitations as to uniformity, etc. Am. Union Exp. v. St. Joseph, 66 Mo. 675; St. Louis v. Sternberg, 69 Mo. 289. Upon vocations subject to the State's

police power inspection fees, which have been fixed by statute, may be levied. State v. Vickens, 186 Mo. 107; Tenny v. Lentz, 16 Wis. 566. (4) The fees authorized by the act to be imposed by the board are not within the State's police power and can only be classified as a tax for revenue; as such tax they are invalid because not assessed and levied in the manner authorized by the Constitution. Dillon, Munic. Corp., sec. 768; Cooley, Con. Lim., 201, 494; Cooley on Taxation, 403; Sheehan v. Good Samaritan, 50 Mo. 155; Glasgow v. Rowse, 43 Mo. 479; State v. Spiegel, 113 Mo. 88; State v. Vickens, 186 Mo. 107. (5) The act is void for uncertainty in not fixing the terms for which licenses may be granted to warehousemen. Sec. 7626, Laws 1907, p. 286; State v. Railroad, 146 Mo. 155; Darling v. St. Paul, 19 Minn. 392; State v. Partlow, 91 N. C. 552; Comm. v. Bank (Penn.), 3 Watts & Serg. 173; 1 Lewis' Sutherland, Stat. Con., sec. 86, p. 141; Railroad v. Comm., 99 Ky. 132. (6) The act is unconstitutional because it attempts to regulate interstate shipments. Globe Elevator Co. v. Andrews, 144 Fed. 871; State ex inf. v. Railroad, 176 Mo. 687; 17 Am. and Eng. Ency. Law (2 Ed.), 76; Railroad v. Ry. Comm. (U. S. Cir. Ct.), 19 Fed. 679; State ex rel. v. Oil, etc., 120 Ind. 575; Baldwin v. Franks, 120 U. S. 678; Poindexter v. Greenhow, 114 U. S. 270; U. S. v. Reese, 92 U. S. 214; Griffin v. State, 119 Ind. 520; N. Y. City v. Miln, 36 U. S. 102; Railroad v. Husen, 95 U. S. 465; Smith v. Md., 59 U. S. 71. (7) Plaintiffs are entitled to equitable relief under their petition. This petition contains all the necessary allegations to authorize the issuance of an injunction. McKenzie v. Wood, 59 Mo. 99; State ex rel. v. Wood, 155 Mo. 425; Robins v. Latham, 134 Mo. 466; Davis v. Gray, 16 Wall. 203; Jacobson v. Mass., 25 Sup. Ct. Rep. 358; Mills v. Green, 67 Fed. 818; Taylor v. Railroad, 88 Fed. 350; Pabst Brew. Co. v. Crenshaw,

120 Fed. 144; City of Hutchinson v. Beckham, 118 Fed. 399; Western Union v. Myatt, 98 Fed. 335; Cummings v. Bank, 101 U. S. 153; Pennoyer v. McConnaughey, 140 U. S. 1; Smyth v. Ames, 169 U. S. 466. (8) An action against the Board of Railroad and Warehouse Commissioners as individuals to prevent them from enforcing an unconstitutional act to the injury of plaintiffs is not a suit against the State. (a) Instances of suits against State officers: State ex rel. v. Wilder, 206 Mo. 541; Hartwig v. Davis, 195 Mo. 380; Business Men's L. v. Waddill, 143 Mo. 495; State ex rel. v. Seibert, 130 Mo. 202; Ex parte Marmaduke, 91 Mo. 228; State ex rel. v. Lesueur, 141 Mo. 29; Hannum v. Waddill, 135 Mo. 153; Reichenbach v. Ellerbe, 115 Mo. 588; State ex rel. v. Hays, 49 Mo. 604; State ex rel. v. Walker, 78 Mo. 139. (b) Held, in the following cases, that suits against the State officers named therein were not against the State: Railroad v. Dey, 1 L. R. A. 744; Reagan v. Farmers' Loan, etc., 154 U. S. 362; Taylor v. Railroad, 88 Fed. 350; Gregg v. Sandford (C. C. A.), 65 Fed. 151; West. Union v. Henderson (C. C. A.), 68 Fed. 588; Cobb v. Clough, 83 Fed. 604; Mills v. Green, 67 Fed. 818; Smyth v. Ames, 169 U. S. 466. (c) The suit is not against the State, but against the individual defendants to prevent their exercising power prejudicial to the business of plaintiffs without authority of law. Va. Coupon Cases, 114 U. S. 269.

LAMM, J.—Defendants stood on their demurrer to plaintiffs' bill having for its life injunctive relief. Standing mute and refusing to plead further, they appeal from a judgment, *nisi,* overruling such demurrer and making perpetual a temporary injunction theretofore granted.

The demurrer challenges the bill in that it fails to state facts sufficient to constitute a cause of action,

Merchants Exchange v. Knott.

fails to state facts entitling plaintiffs to the relief prayed for, or to any relief, and shows on its face an adequate remedy at law.

The bill is an elaborate pleading developing in logical order, in more or less interdependent paragraphs, and delivering divers attacks upon the constitutionality of the grain-weighing and grain-inspecting laws in force in this State, to-wit, sections 7654-7-8-9 and 7660-2-5, 7670-3-4 of article 3, chapter 117, Revised Statutes 1899, and an elaborate statute ordaining State inspection and weighing of grain, enacted by the General Assembly in 1907 (Laws 1907, p. 285, *et seq.*), repealing all of article 3, *supra,* saving the sections above, and enacting 47 new sections bearing, *seriatim,* the same numbers as those repealed.

As the demurrer admits all allegations of fact well pleaded in the bill, but not those in effect legal conclusions of the pleader, we shall set down with particularity the allegations of fact and the grounds of alleged unconstitutionality.

The bill, in substance, alleged:

(1) That plaintiff, the Merchants Exchange of St. Louis, is a domestic corporation doing business in the city of St. Louis and State of Missouri and as such is entitled to sue and be sued, complain and defend in the courts. That it was created to promote the commercial and manufacturing interests of said city and vicinity; to inculcate just principles of trading, to establish and maintain fairness and uniformity in commercial usages, to acquire, preserve and disseminate valuable information, to avoid and adjust controversies between traders, and facilitate the transaction of legitimate business between its members and between them and others and is authorized to further the foregoing ends by adopting needful rules and by-laws. That as such corporation it is in active existence in the city of St. Louis.

(2) That plaintiff, Cochran, is a member of said Exchange and is chairman of its department of weights—a department organized under the rules of the Exchange to secure correct weighing and methods of weighing of property handled by the Exchange and by others requesting such service, and that said Cochran is actively engaged in that business. To that end he has a large number of assistants engaged in the correct weighing of grain handled by members of the Exchange as receivers or shippers—that said members are five hundred or more, practically all the persons engaged in the grain trade in St. Louis.

(3) That plaintiff, the Board of Trade of Kansas City, is a voluntary association organized and controlled by dealers in grain and grain commission merchants in Kansas City, Missouri, of a membership of about two hundred, having the plaintiffs, Brodnax and Bigelow, as president and secretary, respectively, who in turn have authority to sue in the name of said association for its members. That its members constitute practically all such dealers and brokers in Kansas City, and it has also established a department of weights under its rules for the purpose of securing correct weighing and methods of weighing of grain handled by its members and others requesting such service.

(4) That defendants, Knott, Wightman and Oglesby, constitute the Board of Railroad and Warehouse Commissioners of this State, having supervision of the inspection and weighing of grain into and out of public elevators in the State of Missouri, and having power to appoint a chief inspector of grain to act as such under said Board. That defendant Nunn was by it appointed chief inspector and is exercising duties as such in Kansas City. That Nunn has power to appoint deputy chief inspectors of grain and under that authority appointed the defendant Miller as such who has charge of the office of said Board in St. Louis and is

cngaged in the general supervision of the inspection and weighing of grain in said city.

(5) That said departments of weights of said Exchange and Board of Trade have for a number of years severally supervised the weighing of grain received in and shipped from said cities, which system of supervision has become vital to the commercial transactions therein, increasing the grain trade thereof, and increasing the reputation of the markets thereof for correct weighing and fair dealing over a wide section of country inclusive of all sources of grain shipments to said markets in Missouri and in the surrounding States. That by reason of said cities being on the boundaries of Missouri a large part of the grain dealt in as aforesaid is stored in elevators in Illinois and Kansas, where, by reason of comity existing between the legal departments of Kansas and Illinois, the weighing departments aforesaid exercise supervision over grain weighing in said elevators, and that said grain so dealt in and stored in elevators in Illinois and Kansas is interstate in character, though commercially a part of the grain trade of said cities, and is not subject to control by the laws of Missouri.

(6) That it is the rule and uniform custom of said departments of weights to give out to parties entitled thereto certificates of weights, which certificates, by reason of their uniform accuracy, have established the reputation of said markets throughout a wide area and have proved of immeasurable value to the business of said grain dealers and to others shipping to said trade centers. That to prohibit such weighing and the issue of such certificates by said departments of weights would injure the reputation of said grain markets and would lower their reputations and standards for fair dealing.

(7) That by the Grain-Weighing and Grain-In-

specting Act of 1907 certain sections of article 3, chapter 117, Revised Statutes 1899, are repealed (enumerating them) and 47 new sections enacted establishing State inspection and weighing of grain in public warehouses, providing for the conduct thereof, when, where and how grain shall be inspected, for warehouse receipts, inspection and weight certificates, and for the appointment of inspectors and weight-masters with specified duties in the grading of grain and penalties for violations of the act. That said act makes unlawful and strikes down all said functions and duties in weighing and inspecting grain by the departments of weights of said Board of Trade and Exchange, and prohibits said departments from securing accurate weighing of grain in said cities or issuing certificates of weight, and, hence, is unconstitutional as attempting the impairment of the exercise of a legitimate business, violating the right of private contract and interfering with interstate commerce; and its enforcement will destroy the integrity of said markets and work irreparable injury to grain dealers in said cities, destroy the reputation and character of said markets established as aforesaid, and lessen the number of shippers of grain to them.

(8)  A history of the State grain-inspection laws and their growth by amendment is set forth and averments are made to the effect that in connection with State weighing of grain at public grain elevators the said voluntary system of weighing established by said Exchange and Board of Trade sprang up as a vital necessity in weighing and certifying weights not only of grain in public elevators having State weighing, but of grain arriving on tracks and elsewhere not subject to State weighing; that such system was voluntary and services on that behalf were rendered at the instance of interested parties and paid for by fees in

part and in part from the treasuries of the Exchange and Board of Trade. Conditions of said grain trade, growing out of an attempted adjustment to State laws, are pleaded, resulting (it is alleged) in dissatisfaction and evils which the voluntary weighing of grain by the weight departments of the Board of Trade and Exchange remedied, to the betterment of the trade and the general approval of interested shippers. It is averred that the voluntary weighing and certificates of weight aforesaid are demanded by the trade instead of the certification of weights by the weighing bureau of the Board of Railroad and Warehouse Commissioners, and that the enlargement of the duties of said Board provided in sundry sections of the Act of 1907, making the same preclusive and striking down and penalizing the voluntary system of weighing aforesaid, if enforced, will injure the grain trade of said cities and will result in a pecuniary loss to citizens of this State engaged in business in said cities and elsewhere, and that plaintiffs are without adequate remedy at law to prevent such loss and the impairment of their rights as grain-dealers.

(9) Further setting forth reasons for the establishment of the voluntary system of weighing and certification aforesaid (alleging it to be an outgrowth of certain enumerated public needs), the bill alleges such system has been maintained for several years to the satisfaction of buyers, sellers and shippers of grain in those cities and tributary regions. That out of 80,000,000 bushels of grain received in St. Louis in 1906 only 12,500,000 were unloaded in public elevators in that city; that only ten per cent of the grain coming to Missouri is produced in Missouri; that nearly one-third of the elevator capacity of the St. Louis market is in the adjacent territory of Illinois; and that the vast internal commerce in grain among the

States of Illinois, Missouri and Kansas has become dependent upon said system.

(10)   It is further shown to the court that under the Act of 1907 defendants claim power and authority to establish preclusive State inspection and weighing of grain at such place and in such territory within this State as they deem proper, and that thereby it becomes unlawful for plaintiffs or any of them or any others to maintain the voluntary system of weighing and certification of weights aforesaid. That defendants further claim that the business of grain weighing in public elevators or not is solely in the hands of said commissioners and is subject to their discretion as to what places State inspection or weighing shall be established.

(11)   That defendants' claims aforesaid have no legal foundation and that provisions of said act (setting them forth) undertaking to vest in said commissioners power to determine in what places in the State other than in public grain elevators, State inspection and State weighing of grain shall be established and what fees shall be charged therefor, are (as said) unconstitutional and void as an unlawful delegation of legislative power.

(12)   That other provisions of said act (setting them forth) making it unlawful for any person, corporation or association other than bonded weighers authorized by the act to issue or sign any weight certificate, paper or ticket purporting to be the weight of any car, wagon, sack or other package of grain weighed at any warehouse or elevator in this State where State weighers are stationed or to make any charge for such weight certificate or tickets and imposing a penalty for the violation thereof, are invalid as an interference with the right of private contract and business and find no warrant in the police power of the State as justly limited, are a denial of the right of associated

action by owners of grain in a private business concern and are not necessary for the protection of grain growers; that grain owners have for many years past paid the State inspection and weighing charges on grain in public warehouses and have also voluntarily paid for certificates of weight by the Exchange and Board of Trade and are entitled to the additional assurance of additional certificates of weight (all at their own expense); that such prohibition of the right of associated action in private business affairs is violative of due process of law guaranteed by the State and Federal Constitutions; that in interstate shipment of grain such certification of weights is essential to the protection of all parties dealing therein; that the denial of the right of free contract and liberty of association aforesaid, in certifying to weights in interstate commerce of grain, directly and not incidentally or remotely affects such interstate commerce, and for that reason the act is invalid as an attempted interference with commerce among the States.

Finally the bill avers that said commissioners, so claiming and exercising authority under the Act of 1907, are threatening and are about to determine in what territory or in what places State weighing shall be established, and to determine that St. Louis and Kansas City shall be two such places, and to determine and fix the fees to be charged therefor and adopt rules and regulations for the conduct of such State weighing, appoint officers to carry out and enforce the provisions of said act, to thereupon interfere with the voluntary weight systems aforesaid, and are threatening and are about to institute proceedings against said Exchange and its members and those in charge of its departments of weights and also against plaintiffs Brodnax and Bigelow and others, members of said Board of Trade; that they threaten to bring a great number of suits the effect of which will be to demor-

alize and destroy the efficiency of the voluntary weighing departments of said Exchange and Board of Trade, cause great damage to the grain markets of said cities by deflecting grain to other markets by destroying the confidence of shippers in the integrity of said certification of weights—all of which (as said) will cause irreparable injury, etc.; that none of the impleaded defendants have means sufficient to meet the damages so entailed upon the foregoing vested interests by the enforcement of the provisions of said act.

The prayer is as follows:

"Wherefore, the premises being considered, plaintiffs pray that defendants, and each of them, be restrained and enjoined from determining in what places such State weighing shall be established under the provisions of said act, and from fixing the fees to be charged for such weighing, and from adopting rules and regulations for carrying out the provisions of said unconstitutional act, and from naming and appointing officers and employees to enforce the provisions thereof, and from enforcing or attempting to enforce in any wise any of the provisions of the said act, in so far as said provisions authorize the establishment of State inspection of grain, and State weighing at other places in the State at State weighing elevators, and that they be restrained and enjoined, their agents and servants, from interfering in any wise with the weighing departments heretofore established by the plaintiffs in the cities of St. Louis and Kansas City; and that such relief will be endangered and irreparable injury caused unless defendants be immediately restrained from carrying or attempting to carry the provisions of said unconstitutional act into effect; that a temporary injunction be granted, restraining said defendants pending the final hearing of this cause, and plaintiffs also pray such further relief as to right appertains."

It is apparent the unconstitutionality of the act is alleged to consist in:

(a)   An unlawful delegation of legislative power to the Board of Railroad and Warehouse Commissioners to determine the places and territory where, and the circumstances under which, the law shall operate, and to fix fees for State inspecting, weighing and certification of grain.

(b)   An unlawful interference with the right of private contract.

(c)   That it is violative of due process of law as guaranteed by the State and Federal Constitutions.

(d)   That it is a direct interference with the preclusive constitutional power of Congress to regulate commerce among the States.

The foregoing propositions are stoutly maintained on one side and as stoutly controverted on the other by briefs of learning and research covering phases of all of them.   Furthermore, the learned Attorney-General insists that, in any event, plaintiffs are not entitled to injunctive relief.

If we determine the statute is unconstitutional on any one of said grounds, we will stop at that point, treat other questions as reserved for the purposes of the case, and thereafter consider only the point raised that plaintiffs have mistaken their remedy.

It will do to say that in fetching such compass, we are somewhat constrained by the fact that some of the questions made trench on vexed grounds, with boundaries obscurely traced.   The law thereon may be said to be in a condition of flux on some phases, and the last judicial word has not yet been spoken, possibly.   So that, a court holding them in judgment in these latter days may with modest reverence heed the prudent lines of Cardinal Newman's noble hymn:

"Lead, kindly Light, amid th' encircling gloom,
Lead Thou me on;

.    .    .    .    .

"I do not ask to see
The distant scene; one step enough for me."

I. Is there an unlawful delegation of legislative power?

(1) Herein of that phase of the law granting the commissioners power to fix fees for inspecting and weighing grain. Is such provision an unwarranted delegation of legislative power, as discussed in the next paragraph? In our opinion, No. It may stand conceded that the general power to fix official fees is legislative in its character. That this is so may be deduced from the philosophy of the thing, as well as from the frequent legislative exercise of it, as a settled public policy in matters of public concern. Broadly speaking, official fees are intended primarily to pay official salaries, secondarily to swell the State or county treasury by any surplus accumulation. So, too, prescribing fees within fixed limits tends to eliminate extortion—the love of money being the root of all evil. In determining whether there has been an unlawful delegation of power to fix fees we must, however, look sharply to the act in question—reason being the life of the law. Doing so, it becomes plain that the fees contemplated by the act were limited to taking care of the business itself. They were to serve no other purpose—were to be neither too high nor too low, but furnish only so much money, on the one hand, as not to be oppressive to elevatormen, warehousemen and grain dealers, and, on the other, that the business of State inspecting and weighing would not sponge on the public chest. One hand was to wash the other. This is made clear by the last clause of section 7658, Revised Statutes 1899, a section not repealed by the

Act of 1907. Referring to fixing charges for the inspection of grain and the duty of the commissioners to regulate the same, it ordains that: "Which charges shall be regulated in such manner as will, in the judgment of the commissioners, produce sufficient revenue to meet the necessary expenses of the service of inspection, and no more."

Now, while the Act of 1907 provides for the appointment of bonded weigh-masters to receive such compensation as the commissioners shall determine, and provides for fixing fees for weighing, which, in given instances, are to be paid by the warehousemen or elevatormen, and, in others, by consignees (sections 7676-7, 7681, Laws 1907, pp. 296-7-8), and while the act does not in words provide that fees for State *weighing* shall be neither too high nor too low but just enough to pay the running expenses of weighing, yet, taking the unrepealed sections of the old law in connection with the new, we think that is the obvious intent of the lawmaker. The express provision in regard to *inspecting* being to that effect and no surplus accumulation of weigh-master's fees being contemplated, we catch and apply the legislative purposes relating to inspection fees as broadly including weigh-master's fees, and, therefore, hold that the leaven in the inspection provision leavens the whole lump of the law.

Observe, the Legislature did not grant an unregulated power to the commissioners to fix fees. To the contrary, the grant was defined by firm legislative lines drawn around it and the commissioners might not fix fees above a maximum or below a minimum producing revenue enough to cover the service—their discretion was squeezed within those lines.

In this condition of things, the remarks of Mr. Justice SCHOLFIELD in People v. Harper, 91 Ill. l. c. 367, *et seq.,* are in point. In that case the Supreme Court of Illinois held in judgment a grain inspection

law attacked by eminent counsel on the ground that the law illegally delegated the power to fix inspection fees. The Illinois statute under review empowered the Board of Railroad and Warehouse Commissioners to fix the rate of charges for the inspection of grain and the manner in which the same shall be collected; to fix the amount of compensation to be paid to inspectors and other persons employed in the inspection service; and ordained that the charges for inspection are required to "be regulated in such a manner as will, in the judgment of the commissioners, produce sufficient revenue to meet the necessary expenses of the service of inspection, and no more."

It will be seen that such provision is identical with the clause quoted from section 7658, *supra*. Following an exhaustive discussion of the constitutionality of the Illinois statute on general grounds, Justice SCHOLFIELD asserted the following propositions in language meeting our approval:

"No taxation is imposed on any locality by this law; and the power to be exercised is solely for the benefit of commerce in grain which is necessitated to pass through a particular channel, exposing producer, shipper and receiver to the danger of loss through imposition, extortion and fraud, and it can, in no proper sense, be deemed a burden upon the locality.

"There is no provision of the Constitution which, either expressly or by necessary implication, inhibits the General Assembly from committing the inspection of grain to a board created for that purpose; and we are not authorized to say that the Board of Commissioners of Railroads and Warehouses is not quite as legitimate as any other board that could have been selected or created for that purpose.

"It evidently was not designed that the inspection should be made a source of revenue, either to the State or to municipalities; for it is not enjoined as a means

of raising revenue, but solely for the 'protection of producers, shippers, and receivers of grain and produce;' and there is natural justice in requiring that the expenses occasioned by the inspection should be borne by those presumably benefited by it. Certainly no clause of the Constitution is violated by this requirement.

"The principle, repeatedly recognized by this and other courts of last resort, that the General Assembly may authorize others to do those things which it might properly, yet cannot understandingly or advantageously do itself, seems to apply with peculiar force to the fixing of the amount of inspection fees—so as to adjust them properly with reference to the expenses of inspection.

"The expenses of inspection must necessarily vary, to some extent, from time to time, with the changes in the price of labor, office rent, fuel, lights, stationery, etc., and the amount to be received at any given rate per cent for inspection fees must also necessarily vary in proportion as the quantity of grain to be inspected, from time to time, increases or diminishes. And hence an arbitrary, permanent rule, as one by statute would have to be, would be liable either to produce less than the inspection expenses demanded, or an excess which would not be needed, and which would, therefore, to that extent, be an unjust imposition on those paying the fees.

"It would seem obvious that anything like a fair approximation to an adjustment of the fees to the expenses could only be made upon thorough local knowledge, and by changing the rate per cent of fees to be paid, from time to time, and as often as experience should prove to be necessary to correspond with changes in expenses and the fluctuations in the quantity of grain to be inspected.

"The delegation of this legislative function may

therefore well be regarded as a necessary incident to the exercise of this branch of the public power of government; and the reasoning which sustains a like delegation to a city council must be of equal potency here. We cannot say we are clearly satisfied the Constitution has been thereby violated.''

The object of fixing inspection and weighing fees being only to produce revenue to run the business on a cash basis, it becomes at once self-evident, as Justice SCHOLFIELD well says, that there must be a flexibility of power lodged somewhere to bring about adjustment from time to time, and place to place, to subserve the statutory result and purpose. That essential flexibility could never spring from a statute permanently fixing such fees; for if the statute fixed them and the commissioners were given power to unfix them by thereafter adopting a sliding scale, such delegated power would be as obnoxious to criticism as the power to fix them in the first instance. On the satisfactory reasoning of the Harper case, we hold the Legislature was within its power in delegating the ministerial right to the commissioners to fix fees within the general limits prescribed by the act. Accordingly, the point is ruled against plaintiffs.

(2)    We now come to consider a vast and unregulated power, novel and anxious in its vastness and freedom from statutory or judicial control, delegated to the commissioners by the act, to-wit, the vital power to capriciously say (as their ''opinion'' serves) to what places, in what territory and at what times the statute shall apply, or whether it shall be in force on a single square inch of Missouri soil.

Section 7623 reads: ''The Board of Railroad and Warehouse Commissioners are hereby *authorized to establish State inspection and weighing of grain at such places or in such territory within this State as in their opinion may be necessary,* to fix fees for such in-

spection and weighing, and to make all necessary rules and regulations for the proper execution of the powers conferred by this article.''

Section 7625 reads: *"Public warehouses.—All buildings, elevators or warehouses located in any territory wherever State grain inspection and weighing may be established by the State Board of Railroad and Warehouse Commissioners,* in accordance with the provisions of this article, owned or operated, or which hereafter may be owned or operated by any person or persons, association, copartnership or corporation, and used for the storing, transferring, handling or mixing the grain of different owners, are hereby declared public warehouses, and the person or persons, association, copartnership or corporation owning or operating such building or buildings, elevator or elevators, warehouse or warehouses, which are now or may hereafter be located or doing business within this State, as above described, whether said owners or operators reside within this State or not, are public warehousemen within the meaning of this section.''

Section 7630, after providing for inspecting and grading grain at public warehouses and elevators, ordains that: *"And all grain arriving in any territory where State grain inspection may be established* by this article in cars, barges, wagons or sacks, received for storage or sale, and not consigned to public warehouses or elevators, shall also be inspected and graded by a duly authorized State inspector, and the fee for inspection of same shall be a lien on the grain.''

It is obvious that the foregoing grant of power is given without statutory landmark, compass, map, guide-post or corner-stone in one whit controlling its exercise or prescribing its channel, or indicative of any certain intendment of the legislative mind, beyond the mere grant. In essence it is the power of pure and simple despotism. Verily! he that looketh on such

power to lust after it hath already committed a sin in his own heart against the reign of law. Benevolent despotism?—that depends. Mark the following significant things omitted: The act does not define, classify or in any wise earmark the warehouses and elevators upon which or the territory or places in which it shall operate. If it had been certain in its intendment in these particulars, leaving to the commissioners to find the fact as within the statutory description, then another question might be here. Again, the act does not confine itself to elevators and warehouses of a certain given capacity or devoted by their owners to a defined, quasi-public, commercial use. If it had been certain in its intendment in that particular and had left to the commissioners to ascertain and determine whether given elevators and warehouses came within a given statutory designation, then a different question would have been here. Moreover, the act does not confine itself to cities of this, that or the other size or class, nor to places, territories or markets having elevators or warehouses defined in the statute by their use, character or capacity, leaving to the commissioners to find the fact to be as defined by the statute. If the act bore internal evidence that the legislative mind in the exercise of its high prerogative had used its wisdom and judgment in outlining and classifying the places, markets, territories, elevators and warehouses within purview, leaving to the commissioners the ministerial detail of determining in each instance whether a territory, place, market, warehouse or elevator, etc., came within the legislative intent, then a different question would have been here. If more is needed to grimly accentuate the free rein given the commissioners by the statute, it further appears there is no stability about the law, *as a law*. It is left as grass, which to-day is and to-morrow is cast into the oven. For instance, when a city, place, territory or ele-

vator is selected for State inspection and State weighing, say, on Tuesday, the statute does not provide it shall continue as such on Wednesday or thereafter. To the contrary, since the unrestricted power to make (nothing more appearing) would seem to imply the power to unmake, therefore, what is made on Tuesday may be unmade on Wednesday. The statute then is a blanket warrant of attorney to the commissioners to say that State grain inspecting and weighing shall exist one day and not the next, or shall exist anywhere or nowhere, or exist at Warrensburg, Nevada and Trenton and not at Sedalia, Hannibal or Joplin—in North Springfield and not in South, in one block in St. Joseph or Jefferson City and not in another, in St. Louis and not in Kansas City, and at one elevator and not at another—though the same conditions of fact exist in all. In other words, the Board, under the roving commission of a boundless and unregulated discretion given by the statute, may say in effect that in their "opinion" there is, or is no, necessity for the law to operate anywhere, or that (dropping to detail) Jones's elevator is subject to the burdens of State weighing and inspection and Brown's goes scot-free, though both Jones and Brown are doing precisely the same business under the same conditions on opposite sides of the same street at the same time in the same town; and say that said Jones may be struck by the lightning of its penal provisions while said Brown escapes.

As a preliminary remark it is not amiss to say (*de bene esse*) that if a statute by its classification of warehouses, elevators, grain markets, cities, places or territories, itself produced the unjust and unreasonable results mentioned, whether such statute would successfully run the gauntlet of those constitutional provisions exacting equal protection of the law and due

process of law, and prohibiting special legislation, is a question—a question not here for determination.

The blunt question then, is: Is such unlimited power legislative in character? and may the Legislature delegate its exercise to the commissioners?

(a)  Section 1, article 4, of the Constitution provides that:

"The legislative power, subject to the limitations herein contained, shall be vested in a Senate and House of Representatives, to be styled 'The General Assembly of the State of Missouri.' "

Legislative power in Missouri is, therefore, lodged with the General Assembly and not elsewhere except as to such of it as may be delegated under the provisions of that instrument—for instance, to cities in matters of local concern. Briefly, legislative power is the power to make laws. What is a law? "Municipal law," says Chancellor KENT, "*is a rule of civil conduct prescribed by the supreme power of a State.*" [1 Kent Com. (14 Ed.), 447.] That definition is part of Sir William BLACKSTONE'S, which adds, "commanding what is right and prohibiting what is wrong." In his notes to Blackstone (1 Sharswood's Blk. Comm., p. 44) Judge SHARSWOOD defines a law to be: "A rule of civil conduct prescribed by the supreme power in a State, commanding what is to be done, and prohibiting the contrary."

Now, a rule is a *rule,* as distinguished from whim, caprice, compact, agreement, or mere discretion. "Prescribed" means that the rule must not remain in the breast of the Legislature but shall be manifested and published in a public and conspicuous manner so as to be known as a rule of civil conduct. [1 Blk., p. 45.] That author instances Caligula's laws as violative of the idea evidenced by the word "prescribed." For it is said of that Emperor, according to Dio Cassius, that he wrote his laws in a very small character and hung

them upon high pillars, the more effectually to ensnare the people. Moreover, the rule must be "prescribed *by the supreme power in a State*"—not by Roe, Doe, Box, Cox, *et al.* Speaking to that part of his definition, Blackstone says [1 Blk., 46]: "For legislature, as was before observed, is the greatest act of superiority that can be exercised by one being over another. Wherefore, it is requisite to the very essence of a law that it be made by the *supreme power*. Sovereignty and legislature are indeed convertible terms; one cannot subsist without the other."

(b)  Measured by the foregoing definition of law, can the statute stand? We think not. We are of opinion that the power to bind and loose, to inaugurate or suspend the operation of the law, to say when and where it is law is of necessity an inherent and integral part of the law-making power, not to be delegated to, and wielded by, any commission. True, the act was passed by the General Assembly, approved by the Chief Executive and stands published as authenticated. law, but to all intents and purposes it is only a barren ideality, having such life as is thereafter breathed into it from an unconstitutional source. No Missourian may know whether it applies to him or his concerns, as a rule of civil conduct, or will ever apply until in the "opinion" of the commissioners it "may be" considered "necessary."

The General Assembly may not clip itself of one iota of its lawmaking power by a voluntary delegation of any element of it—by putting its constitutional prerogatives, its conscience and wisdom, "into commission." On this point Judge Cooley says in an oft-quoted passage (Cooley's Const. Lim. (6 Ed.), 137): "One of the settled maxims in constitutional law is, that the power conferred upon the Legislature to make laws cannot be delegated by that department to any

other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the Constitution itself is changed. The power to whose judgment, wisdom, and patriotism this high prerogative has been intrusted cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust.''

And, as pointed by counsel, the philosopher John Locke, Locke on Civil Gov't, sec. 142, announces the sum of the matter to be: ''These are the bounds which the trust that is put in them by society, and the law of God and nature, have set to the legislative power of every commonwealth, in all forms of government. First—They are to govern by promulgated established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plough. . . . . Fourthly— The Legislature neither must nor can transfer the power of making laws to anybody else, or place it anywhere but where the people have.'' Concretely applying the general principles above announced are the adjudged cases collated by the counsel: State v. Field, 17 Mo. 529; Ruggles v. Collier, 43 Mo. 353; St. Louis to use v. Clemens, 43 Mo. 395; Matthews v. Alexandria, 68 Mo. 115; St. Louis v. Heitzeberg Packing Co., 141 Mo. 375; Kansas City v. Bacon, 147 Mo. 259; Neill v. Gates, 152 Mo. 585; Owen v. Baer, 154 Mo. 434; State ex rel. v. Young, 29 Minn. 551; Dowling v. Ins. Co., 92 Wis. 63; Anderson v. Assurance Co., 59 Minn. 182; O'Neill v. Ins. Co., 166 Pa. St. 72; State v. Railroad, 100 Minn. 445. See also cases on delegated legislative power collated and quoted from *in extenso* by GANTT,

C. J., in his dissenting opinion in State *ex rel.* Judah v. Fort, 210 Mo. l. c. 555, *et seq.*

(3) To sustain the constitutionality of the statute the learned Attorney-General argues, in effect, that this court has held in a former case (State *ex inf.* v. Goffee, 192 Mo. l. c. 689) involving the old State Inspecting and Weighing Act, that such a statute was within the constitutional authority of the General Assembly, exercising the State's police power. We affirm that general doctrine; we decline to be tossed to and fro by every wind of doctrine on that proposition; but the question here is one of *delegation* of the police power, not the *exercise* of it by the General Assembly. The power to regulate weights and measures has been exercised by lawmaking power from immemorial days, whereby (for example) the length of the arm of King Henry The First is perpetuated in our modern yard, and the length of the inch was made that of three grains of barley put end to end. The pertinent maxim is: I must so use my own as not to injure another's property. (*Sic utere tuo,* etc.) In the great case of Munn v. Illinois [94 U. S. 113], the solid common law foundation of the right to regulate the business of those who take tolls at mills, warehouses, wharfs, ferries, etc., or who stand at "the gate-way of commerce and take toll from all who pass," common carriers, etc., is shown. The opinion of Mr. Chief Justice WAITE in that case, as noted by Judge TAYLOR who heard the case at bar, *nisi,* has "become a classic in the law." It established, as on a rock once for all, the police power to regulate businesses and property devoted to a quasi-public use. The contention of the learned Attorney-General, then, may be allowed as sound law; but it does not reach the heart of the matter here.

Again, to sustain the constitutionality of the act in the particulars under discussion, he relies upon People v. Harper, *supra*; but an examination of that

case shows the Illinois statute classified warehouses into classes A, B and C. Certain sections of that act are set forth in the case of Munn v. Illinois, *supra* (p. 116). For our purposes section 2 will sufficiently point the differences between the Illinois statute, the constitutionality of which was sustained, and the Missouri statute of 1907. Section 2 reads:

"Sec. 2. Public warehouses of class A shall embrace all warehouses, elevators, or granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which grain is stored in such a manner that the identity of different lots or parcels cannot be accurately preserved, such warehouses, elevators, or granaries, being located in cities having not less than one hundred thousand inhabitants. Public warehouses of class B shall embrace all other warehouses, elevators, or granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together. Public warehouses of class C shall embrace all other warehouses or places where property of any kind is stored for a consideration."

Even a glance will show that the Illinois statute did not delegate to any commission the power to classify warehouses, or elevators, or to deliminate and designate places and territories and times where and when the law might operate. The lawmakers did that. The Illinois statute by other sections did delegate to a commission the right to regulate fees and such delegation in the Act of 1907 we have sustained.

Again, it is argued by the Attorney-General that a class of cases holding that, while a Legislature cannot delegate its power to make a law, yet it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend, sustains the constitutionality of the present statute.

Many cases attest the soundness of the proposition that the Legislature in making a law can delegate a power such as just indicated. For instance, Crowley v. Christensen, 137 U. S. 86; Locke's Appeal, 72 Pa. St. 491; Land & Stock Co. v. Miller, 170 Mo. 253. See, also, authorities cited, *supra,* in this paragraph. But the power delegated to the commission by the Act of 1907 is not the power to determine a *fact.* It is the wholesale, unregulated power to say, in effect, there shall be an operating law or no law, to say where the law shall operate, on whom and when. This phase of the case, having been heretofore fully developed, needs no further attention, beyond saying that no man in Missouri holds his property or rights, subject to the unregulated discretion of any other man.

The Attorney-General further seeks to sustain the constitutionality of the act by reference to principles underlying local option laws, road laws, district school laws, dramshop laws, drainage laws, quarantine laws, etc. He argues that the delegation of power here is not essentially different from the delegation of power in those laws—all sustained by this court. We shall not discuss the underlying principles, which applied with discrimination, have sustained the validity of the laws in question. Some of them, notably the quarantine law, stand on principles referable to the maxim: "The safety of the people is the supreme law"—a maxim as old as the Twelve Tables of Rome —and all of them were held valid on legal principles not sustaining, when properly applied, the act under review.

The premises considered, we hold the act unconstitutional in the particulars in hand.

II. Assuming the act unconstitutional in precedent particulars, then, does the bill state a cause of action for equitable relief?

Plainly, relief is predicated of at least two favorite and ancient foundations of equity jurisdiction, viz.: (1) Irreparable injury (the wrong-doers having insufficient means to respond in damages) and (2) a multiplicity of suits. The bill alleges, in effect, that defendants are about to bring down upon the devoted heads of the employees and members of the Board of Trade and Exchange a swarm of vexatious and expensive suits to enforce the act. The pleader does not define the character of the suits, whether civil or criminal. In this particular the bill is as vague and significant in its omissions as we have held the act itself to be in other respects. The act bristles with impaling penal provisions making certain violations of it misdemeanors—others, felonies. If the pleader meant that the officers, members and employees of the Merchants Exchange and Board of Trade are about to be visited with arrest, arraignment and trial at the hands of the State authorities in criminal courts for violation of criminal law, valid or invalid, it could hardly be contended they did not have an adequate legal remedy, and that the bare fact of pending or imminent criminal prosecutions entitled them to equitable relief. [State ex rel. v. Wood, 155 Mo. l. c. 451, et seq.; State ex rel. v. Canty, 207 Mo. l. c. 460, et seq.]

Our examination of the act does not make it clear what other suits could have been meant. There is no provision making it the duty of defendants to bring any civil suits, that we can see. If learned counsel had the latter character of litigation in mind, doubtless the facts were of such kind as could have been pleaded and not left in nubibus. In our opinion the bill does not state a cause of action on the ground of a multiplicity of suits.

But the charge of irreparable injury is sufficient to sustain the jurisdiction of a court of equity. The ob-

jection made to the charging part of the bill in regard to irreparable injury, is, in substance, that the pleading is a mere bundle of conclusions, and that no traversible allegations are made upon which issue can be joined and upon which irreparable injury can be predicated, but we do not agree to that. Plaintiffs allege that their business (describing it) of grain weighing and certification, a valuable asset and property right in grain dealing, built up (they say) and nurtured for many years by them, is about to be struck down and ruined and their grain markets ruined in ways pointed out by the enforcement of an unconstitutional law. The thing threatened to be done directly pertains to property rights which the bill alleges plaintiffs have acquired. Certainly, it could not be contended that the business of grain dealing, grain weighing and grain certification by grain dealers, warehousemen, and elevators is *per se* an illegal business. Conceding it is under the State's police power, yet that police power must be exercised through a valid law. Now, an unconstitutional law is the same as no law at all; and, on demurrer, we must assume the allegations of the petition relating to irreparable injury in the way specified are true. This being so, we conclude the bill states a cause of action, and nothing said in State *ex rel.* v. Wood, *supra*, when rightly understood, militates against that conclusion.

Finally, it is argued that defendants, as members and employees of the State Board of Railroad and Warehouse Commissioners, are in effect the State of Missouri, therefore, this suit, to all intents and purposes, is against the State and, as a sovereign State cannot be sued by its citizens, the plaintiffs must be cast. We shall not enter upon the discussion of that theory. That the sovereign State may not be sued is a truism. It was the proud boast of Louis The Fourteenth that: "I am the State." (*L'etat, c' est moi.*)

But defendants are scarcely entitled to the protection of that imperial dogma in this case. They are mere plain ministerial officers, charged to be about to do irreparable injury to the business interests of their fellow-citizens by unlawful acts. As such ministerial officers, so charged, they are not beyond the strong arm of a court of equity. See authorities cited by counsel for plaintiffs.

The highest court in the land has so lately held this matter in judgment and decided it against the contention of the learned Attorney-General (Ex parte Young, Petitioner, decided March 23rd, 1908, by the Supreme Court of the United States, and reported in 28 Sup. Ct. Rep. 441), that it would be supererogation to prolong this opinion otherwise than by announcing our conclusion that the point is ruled against defendants.

This leads to the affirmance of the judgment. Let it be so ordered.

All concur, except *Valliant, J.*, absent.