CLARENCE B. REED, Plaintiff in Error, v. JACKSON COUNTY, Defendant in Error.—142 S. W. (2d) 862.

Division One, September 4, 1940.*

*Proctor & Proctor* for plaintiff in error.

*NOTE: Opinion filed at September Term, 1939, March 6, 1940; motion for rehearing filed; motion overruled at May Term, 1940; May 7, 1940; motion to transfer to Court en Banc filed; motion overruled at September Term, 1940, September 4, 1940.

*Jno. B. Pew* and *Rufus Burrus* for defendant.

722

BRADLEY, C.—Clarence B. Reed, plaintiff below and plaintiff in error here, filed two separate suits against Jackson County. One was on his own behalf and the other, in 49 counts, was as assignee for 49 others. Judgment in the total sum of $41,673.25, plus interest, was asked. These suits were consolidated and tried together as one cause. The purpose was to recover an alleged balance due each individual as deputy assessor of Jackson County. A jury was waived; the court found for defendant, and the cause was brought up by writ of error.

From January, 1931, to May, 1931, both inclusive, plaintiff and his assignors were deputy assessors of Jackson County. Some were in class B; some in class C, and some in class D. [See Sec. 11834, R. S. 1929, Mo. Stat. Ann., p. 7040.] This section has been amended,

Laws 1933, p. 373, but the amendment does not affect the present case. The pay for these classes of deputy assessors in Jackson County is fixed by the statute (Sec. 11834) at $2100 per year for the B's, $1800 per year for the C's, and $6 per day for the D's ''for such time as they may be actually employed in the discharge of their duties.'' As we understand, this cause involves the claims of 2 class B's, 25 class C's and 23 class D's. The county was hard put for money, and, beginning January 1, 1931, each deputy, over the period concerned, was paid, each month, on a *time* base, *less'* than actually put in, and this arrangement was adopted and followed in order to avoid the discharge of any deputy. In January, 1931, Frank R. English was the assessor, W. F. Cook was chief deputy, and Hon. Harry S. Truman, now U. S. Senator, was presiding judge of the county court. Senator Truman testified that ''Mr. Cook and Mr. English came to the county court and stated that if they were allowed to put their deputies on a day basis or a per diem basis . . . they would rather be allocated a certain amount of money for the purpose of operating their office rather than have the number of deputies specified . . . People were being discharged everywhere and everybody was making an endeavor to keep as many people at work as possible, and the county court agreed with Mr. English and all the rest of the departments to allow them to pay their men by the day. . . . In other words, have a larger number of D deputies instead of having a group of A, B, C, and D deputies, as the law provided; that allowed them to pay a man ten days or twenty days or thirty days, however many he worked. . . .''

The appointment of each deputy was typed or printed, and captioned ''commission of deputy county assessor;'' was dated, gave the name of the deputy, and his or her classification, and was signed by the assessor. On the commission was a typed or printed oath of office, which oath each deputy signed and took.

The monthly payroll (prepared in the county clerk's office) contained the *names* of the deputies, the *class*, the *purported number* of days each worked during the month (except as to two), gave the pay as $6 per day, the total for each for the month, and a column headed ''remarks,'' and from January 1, 1931, over the period involved, the payrolls carried all the deputies, with the two exceptions, as in class D.

Before the pay check or warrant for the month was delivered, the deputy signed the payroll sheet under ''remarks.'' Always the number of purported days each deputy worked, as shown on the monthly payroll, was, as stated, supra, *less* than the number of days *actually* worked. To illustrate: Mary Sartor was designated as in class D in her appointment or commission and under the statute her pay was $6 per day for the time she actually put in. In January, 1931, she actually worked 26 days, but was paid for only 22, as her *time* put in appeared on the January payroll. And so it went each month for each

deputy over the period involved, and for Mary Sartor, the total hold-back was $843.50. Each deputy *consented in advance* to this *modus operandi* and each signed the monthly payroll knowing full well that the *days worked,* as shown thereon, was not correct. Quite a few of the deputies were witnesses and some frankly admitted that they consented in advance to the plan and were ''glad to do it.'' Others were not so frank. However, we proceed on the theory that each deputy freely consented in advance to the arrangement and made no complaint until out of office.

The trial court found ''that the C deputies, by and through the arrangement to reduce the pay instead of reducing the number of deputies, and by receiving compensation at the rate of $6 per day, and signing the payroll wherein they were designated as D deputies, are now estopped from claiming any more or further compensation for services as deputy assessors; that Steinhauser and Love (B's, and the two above referred to), by accepting and receiving compensation as C deputies, and signing the payroll on which they were so designated, are estopped from recovering further compensation.''

Various grounds are advanced by defendant to support the result reached by the trial court, but the two of substance are estoppel and the five years Statute of Limitations. [Sec. 862, R. S. 1929, Mo. Stat. Ann., p. 1143.]

Galbreath v. City of Moberly, 80 Mo. 848, was to recover for an alleged unpaid part of a city marshal's salary. Plaintiff was city marshal of Moberly from August 1, 1877, till April, 1880. An ordinance approved July 5, 1875, fixed the salary of the city marshal at $75 per month. Before plaintiff's election in 1877, the city council passed a *resolution* purporting to reduce the salary to $60 per month, and plaintiff was paid $60 each month, which he accepted at the time without complaint. The answer pleaded the ''monthly settlements with plaintiff at the rate of $60 per month, and a final settlement with him at the expiration of his term of office for salary as marshal. . . .''

The sole reason offered by plaintiff, in the Galbreath case, for going behind the settlements was that, at the time, ''he supposed the council had passed a valid ordinance reducing the salary to $60 a month, and did not know any better until after the settlements.''

The trial court found that the plaintiff could not recover and this finding was affirmed on the theory that the *settlements* bound plaintiff.

State ex rel. Whalen v. Player, 280 Mo. 496, 218 S. W. 859, was in mandamus to compel the city comptroller of St. Louis to pay relator's (alderman's) salary at the rate of $1800 per annum under the new charter instead of $300 per annum as fixed by the old charter. Among the defenses was estoppel. The trial court ruled

against plaintiff. On appeal plaintiff prevailed and of the defense of estoppel the court said (218 S. W. l. c. 861):

"Nor did the relator waive his right, nor is he estopped to claim the salary due him, by receiving $25 per month from the city. He received this sum under protest and claimed, at the time, that he was entitled to be paid at the rate of $1800 per year, the salary of an alderman fixed by the new charter. There was no settlement with relator by the city, as in the case of Galbreath v. Moberly, 80 Mo. 484, nor settlement and compromise, as in the case of McNulty v. Kansas City, 201 Mo. App. 562, 198 S. W. 186, relied on by respondent."

The authorities on the questions involved in the present cause were reviewed at length in State ex rel. Rothrum v. Darby et al., 345 Mo. 1002, 137 S. W. (2d) 532, and there is no occasion to go over the field again. That case was in mandamus to compel the necessary action to pay Rothrum an alleged balance due on his salary as a motor driver of the fire fighting division of the fire department of Kansas City. The trial court found against him and he appealed. The plan followed in the Rothrum case was to deduct from the monthly salary, as fixed by ordinance, for leaves of absence that Rothrum did not take. Each month, that the deduction was made, Rothrum signed a printed application for a leave of absence without pay, and the deduction corresponded in amount with the purported absent period. The reason for the deduction was the same as in the present case. In that case the question for decision is stated thus:

"The real question is validity of an agreement for deductions from pay fixed by ordinance (without any change by ordinance), made between executive officers (the City Manager and department directors) and the other appointed city officers or employees; considering such an agreement either to be implied from the terms of the leave of absence agreements or from acceptance of pay as shown in the payrolls or as an oral contract. Appellant (Rothrum) contends that such an agreement was void; that to withhold and refuse to pay part of his salary fixed by ordinance was unlawful and arbitrary; and that he was thereby deprived of his property without due process of law, in violation of Section 30, Article II of the Constitution of Missouri and the Fourteenth Amendment of the Constitution of the United States."

There seems to be a difference of opinion among the courts of the land on the question in the Rothrum case and in the present case, and of this we said in the Rothrum case: "The majority rule is that such an agreement is void on grounds of public policy. [For cases see 70 A. L. R. 975 note; 118 A. L. R. 1458 note; see also, Orthwein v. St. Louis, 265 Mo. 556, 178 S. W. 87 and cases cited; 46 C. J. 1027; sec. 275; 43 C. J. 702, sec. 1173; 19 R. C. L. 920, sec. 220; 22 R. C. L. 537-541, secs. 234-239; 2 McQuillin, Municipal Corporations

(2 Ed.), 330, sec. 542; Throop's Public Officers, secs. 52 and 456; Mechem on Public Officers, sec. 377.] Cases showing the minority view, upon which respondents' rely, will also be found in these A. L. R. notes.''

It is further said in the Rothrum case that ''an even more vital ground is, that public office, and compensation therefor, is not and must not become a matter of contract. [Mechem on Public Officers, secs. 463 and 855.] Public offices and positions belong to the people and not to officers upon whom they confer appointive power. [22 R. C. L. 377, 379, secs. 9, 11.] The qualifications, tenure, and compensation thereof must be determined by the people or the people will lose control of their government. This must be done by the representatives the people have authorized to act for them, unless the people themselves have determined these matters by writing them into the Constitution. If the people have not thus themselves determined them, then under our Constitution and theory of government, these are legislative powers. [Merchants Exchange of St. Louis v. Knott, 212 Mo. 616, 111 S. W. 565; Throop's Public Officers, secs. 19, and 443-444.]''

The office of deputy county assessor is a recognized public office and the Legislature has fixed the compensation to be received by the holder of such office, and the Legislature (Sec. 3939, R. S. 1929, Mo. Stat. Ann., p. 2759) has made it a crime for anyone seeking election to any ''office of honor, trust or profit'' to ''offer or promise to discharge the duties of such office for a sum less than the salary, fees or emoluments of said office, as fixed by the laws of the State.''

The public policy of a state is determined by ''its statutes and when they have not . . . spoken, then in the decisions of the courts.'' [In re Rahn's Estate, 316 Mo. 492, 291 S. W. 120.] ''The very highest evidence of the public policy of any state is its statutory law.'' [In re Rahn's Estate, supra, 291 S. W. l. c. 123, and cases there cited.]

In view of our statute and court decisions, especially the Rothrum case, it seems clear that to permit public officers, elected or appointed, to receive, by agreement or otherwise, a less compensation for their services than fixed by law, would be contrary to the public policy of the State. The compensation of deputy county assessors is, as stated, fixed by the Legislature and the Legislature only can change it. Defendant contends that carrying the C's on the payroll each month as D's, and the signing of the payroll each month by the C's, was, in effect, a reclassification of the C's as D's. If the deputies had been paid for the *actual* time put in as was suggested by Senator Truman, the situation here would be different, but that was not done.

Practically every question (except on limitations) involved in the

present case was ruled in the Rothrum case, and ruled adversely to defendant's contentions here, hence we pass to the question on limitations.

This cause was filed February 24, 1934, and when filed it was one petition in 50 separate counts. The first count was on plaintiff's individual case and the other 49 were for the claims of his assignors. December 11, 1936, plaintiff dismissed as to count one (his individual case) and filed separate petition for his own claim, and on the same day he amended the remaining 49 counts by interlineation in and by striking out certain parts of the second paragraph of each count. To illustrate what was interlined and stricken we take the count stating the claim of deputy Brackett. The second paragraph, as amended, follows (italicized part was interlined and part in parenthesis was stricken):

"Plaintiff states that said Ed D. F. Brackett *at all times mentioned herein is and was* a resident of Kansas City, Jackson County, Missouri, and that before January 1, 1931, and on and after January 1, 1931 and until June 1, 1933, the said Ed D. F. Brackett was a duly *appointed,* qualified and (acting employee of the county assessor's office) *lawfully commissioned class C deputy county* assessor of Jackson County, Missouri; that by virtue of such (position) *office* said Ed D. F. Brackett was entitled to receive from Jackson County, Missouri, a political subdivision of the State of Missouri, *containing more than 500,000* inhabitants, under and by virtue of the laws of the State of Missouri, the sum of $4,350.00, as shown by itemized statement hereto attached, marked exhibit B and made a part of this petition as fully as if set forth herein."

Defendant argues that the original petition did not state a cause of action, and that the amended petition would not relate back and save from the bar of the statute the monthly holdbacks prior to December 11, 1931, which holdbacks were more than five years before the amendments to the petition and more than five years before plaintiff's separate suit was filed.

"Where the declaration states no cause of action whatever, it will not arrest the running of limitations; and an amendment made after the bar of the statute is complete will be regarded as the beginning of the action, in reckoning the statutory period of limitations." [37 C. J., p. 1078, sec. 516; Arpe v. Mesker Bros. Iron Co., 323 Mo. 640, 19 S. W. (2d) 668, and cases there cited.] In ruling a like question in the Arpe case the court said (19 S. W. (2d) l. c. 670): "The general rule is that an amendment will not have such effect (relate back) if the proof necessary to support the pleading as amended is different from the proof necessary to support the same pleading before such amendment; for such an amendment would constitute a departure."

We can perceive of no fact, admissible under the amended petition,

728

that would not have been admissible under the original petition, and we rule this assignment against defendant.

The judgment should be reversed and the cause remanded with directions to enter judgment for plaintiff as asked. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.