STATE EX REL. RAY P. PREWITT v. JOSEPH B. THOMPSON, State Superintendent of Insurance, Appellant.—66 S. W. (2d) 109.

Division One, December 6, 1933.

*Roy W. McKittrick*, Attorney-General, and *Gilbert Lamb*, Assistant Attorney-General, for appellant; *G. C. Weatherby* of counsel.

*Cullen, Fauntleroy & Edwards* for respondent.

STURGIS, C.—This is a suit for mandamus brought in the Circuit Court of Cole County seeking to compel the State Superintendent of Insurance, appellant, to issue to relator a license as an insurance broker as provided by Section 5904, Revised Statutes 1929. That statute defines the term "insurance broker" and provides that the State Superintendent of Insurance may on payment of a fee of ten dollars issue to any person a license or certificate of authority to act as an insurance broker, and prohibits under penalty any person from so acting without such license. Such statute also gives the Superintendent of Insurance the power to revoke such license "for cause."

The case was tried in the trial court on the pleadings. The relator, respondent here, filed his petition on which the circuit court issued its alternative writ commanding the respondent, appellant here, to issue the license as prayed for by relator or show cause for not doing so. The respondent, Superintendent of Insurance, made his return to the alternative writ stating his reasons why he had refused to issue the license. To this return the relator filed his demurrer challenging the return as not stating any sufficient facts or reasons for refusing the license. The court sustained the demurrer to the return and ordered a peremptory writ of mandamus to issue. The respondent below, appellant here, has duly appealed. The appeal is here because of the constitutional question involved. We must, therefore, go to the pleadings for the facts and issues.

The relator in his petition for mandamus, which is copied in the alternative writ, anticipating the defenses of the respondent, set up the reasons why respondent refused relator a license and states that a committee of the General Agents' and Managers' Association of St. Louis, where relator resides and carries on his insurance business, had reported to the State Department of Insurance that relator, together with four other named persons, had been guilty of "twisting or attempted twists by misrepresentation;" that on a hearing of this charge by the State Insurance Department the charge of using any misrepresentation in procuring or writing insurance was abandoned as being immaterial, but that relator was found guilty of "twisting" insurance within the meaning of that term as defined and used in a ruling made by the State Insurance Department relative to licensing insurance agents and brokers, as follows:

"(a) The Missouri Insurance Department defines it as follows: 'Twisting' is inducing or attempting to induce the holder of a life insurance policy to surrender that policy and then take out new insurance in the company represented by the agent who advises the surrender. The advice may be direct or indirect. The element of misrepresentation may or may not be present.

"(b) The Superintendent defines 'Twisting' as I read it in the original statement, and it is his position that it may be accomplished

with or without misrepresentation, and that he will revoke, refuse to issue or suspend any license in any case where 'twisting' is indulged in, either with or without misrepresentation.''

Relator then averred that said Superintendent of Insurance "intends to invoke said rules (a) and (b) and under and by virtue of said rules to refuse to issue to relator his license as a broker because he told the truth about all matters relating to the insurance he was selling and the insurance which the prospective buyer of insurance carrier, and that said Superintendent will refuse to issue to him said license as a broker and has so stated, and your relator further states that the proceedings instituted and followed as aforesaid are in excess of the jurisdiction and authority of said Superintendent of Insurance.''

The relator then avers that he was for a long time and until recently the general agent of the Lincoln National Life Insurance Company of St. Louis, a solvent company organized and doing a large business under and in full compliance with the laws of this State; that such company, among others, issues a policy known as a ''Modified Whole Life Policy'' on a plan known as the ''Emancipator Plan,'' which policy ''is issued at a lower premium up to the age of 72 than was and is now charged by companies issuing policies having high reserve features.'' This form of policy and plan of insurance is described and set out at some length and its claimed advantages over what may be called ''Unmodified Whole Life Policies'' are pointed out. Such policies doubtless have low reserve features, which, under some circumstances at least, would be a disadvantage. For the purposes of this case it is unnecessary to discuss at length or determine whether these claimed advantages are in fact real or merely apparent. To one not an insurance expert it would seem that the ''Emancipator Plan'' is to insure a person at a premium rate based on his life expectancy at the insured's then age with the *privilege,* or rather stipulation, that if the insured lives to a period five years short of his life expectancy, he shall then either reduce the amount of the policy or increase the rate of his insurance, in default of which his insurance will end at the age of seventy-two. Another claimed advantage to the policyholder in switching a policy to one on the ''Emancipator Plan'' is based on the fact that insurance companies find that they earn only about three or three and one-half per cent net on their reserve funds, while money can be loaned by individuals at five or six per cent. So the inducement is held out to a policyholder who has carried a policy, say a twenty-year endowment, for several years and has a large cash reserve which will be paid on the surrender of the policy, that by cashing out the reserve he can loan the money, or, if he has already borrowed from the company, pay off that loan, and with the interest on the cash reserve pay the premium on a low rate policy on the Emancipator

Plan at a considerable saving. This argument, however, may have the same infirmities as the argument that it is better to loan money at six or seven per cent on real estate or other supposedly good securities than to invest in government or municipal bonds at three or three and one-fourth per cent. The only point we desire to make in this connection is that, after all, the right to contract as he pleases should be preserved to each individual, however unwisely it may be exercised, unless the contract is tainted with fraud or induced by misrepresentation or deceit.

In this connection relator alleges that "the 'Modified Whole Life Policy' written on the 'Emancipator Plan' or on a plan substantially similar to said plan is a good, safe and fair form of policy, and it contains no provisions contrary to the laws and public policy of the State of Missouri, but in all respects said policy conforms to the laws and the public policy of said state. . . . That there is a widespread and great demand in this State for the Modified Whole Life Policy written in accordance with the Emancipator Plan or containing terms and provisions substantially similar to the Emancipator Plan Policy, and relator says that if he is granted a broker's license he intends to exercise his activities as a broker in selling all kinds of life insurances policies issued by the various companies doing business in this State, including the Modified Whole Life Policy written in accordance with the Emancipator Plan, which is now being issued and sold by various companies in the State of Missouri."

Relator then avers that "he has not individually or as a broker, an officer, a director or agent of any insurance company, issued or circulated or caused or permitted to be issued or circulated any estimate, illustration, circular or statement of any sort misrepresenting the terms of any policy issued by any insurance company or the benefits or advanages promised by any insurance company, or the dividends or shares of surplus to be received on any policy issued by any insurance company, nor did he use any name or title of any policy or class of policies misrepresenting the true nature thereof, nor will he do or cause to be done any of said things in the future, if a broker's license should be issued to him." (Note: This means that relator has not violated Secs. 5733 and 5773, R. S. 1929.)

Relator further says that "he has always and at all times conducted the life insurance business in a straightforward, honorable way; that he has never been guilty of any misconduct; that his character is good, and that the sole and only reason why the said Insurance Commissioner is about to refuse him a license is that he has been selling and may in the future sell to holders of insurance policies, policies of other companies issued on the Emancipator Plan, and that in some instances the persons so insured may drop their old policies and take the new ones sold by him."

The return made by the State Insurance Superintendent does not

deny any of the facts stated in the relator's petition for mandamus, but admits all the formal matter stated and that relator made application for license as an insurance broker and has tendered the required fee. He then states by way of affirmative defense and as a reason why he refused and should not be compelled to issue relator the license prayed for. that on the hearing had on the complaint made against relator's right to have a license as an insurance broker. "it appeared from the testimony offered and the admissions of relator that in writing life insurance in this State he did, *without misrepresentation*. induce many persons to drop insurance policies already in force in companies authorized to do business in this State other than the company represented by said relator. and did. without misrepresentation. induce many policyholders to take out (in lieu of their old policy or policies) a new policy in a life insurance company represented by said relator, which company was also authorized to do business in the State; and respondent says that in his judgment the conduct of the relator in so inducing policyholders to take out new policies for old ones, even though the element of misrepresentation be not present, constitutes sufficient cause for refusing to issue a broker's license to said relator."

"Further answering; the defendant. says that in 1915 the then Superintendent of Insurance of the State of Missouri promulgated a rule of the department relative to the practice of twisting life insurance policies, that is to say, that the twisting business by insurance companies and their representatives would not be permitted because, as applied to life insurance business, it was harmful to the general public in that the surrender of a life insurance policy for the purpose of taking other insurance could not but result in injury to the policyholder for the reason that by its very nature a life insurance policy accumulates a value as the policy grows older, and that such practice frequently caused policyholders to lapse a policy and surrender their insurance without taking out new policies; that generally the practice was unethical and unfair and detrimental to the business of both companies and policyholders; that it has been the ruling of the Insurance Department of the State of Missouri since 1915 that 'twisting' consists of inducing or attempting to induce the holder of a life insurance policy to surrender that policy and then take out new insurance in the company represented by the agent who advises the surrender. The advice may be direct or indirect. The element of misrepresentation may or may not be present. That such practice as defined with or without misrepresentation was detrimental, injurious and harmful to the insuring public and would not be tolerated on the part of either domestic or foreign insurance companies doing business in this State; that it would be considered just and valid grounds for the refusal of a license to agents and brokers engaging in such practice, and good cause for revoking

such license, if issued, to anyone thereafter engaging in such practice.''

The Superintendent of Insurance then sets out the reasons for the establishment of the rule against twisting of life insurance policies, which he states as follows:

''(a)  There is a new and additional acquisition cost which must be borne either by the new policyholder or distributed among other policyholders in the same company, thus increasing the cost of insurance.

''(b)  There is a surrender charge for the first year or years, which is incurred by the policyholder for the second time.

''(c)  The insurance is written at a later age and necessarily at a higher cost.

''(d)  The former policy has become incontestable whereas the new policy must remain contestable for at least a period of one year.

''(e)  The cash or reserve value of the policy surrendered, which constituted a safe and secure savings and a possible endowment for old age, is re-exposed to the ordinary risks and hazards of trade and investment.

''(f)  The insurance sought to be effected by the new policy may almost invariably be secured in the same company, without 'twisting' and the insured retain his age rate and increasing reserve value without reductions for acquisition costs.

''(g)  The practice of 'twisting' is universally held to be unethical by all companies and is by them prohibited.

''(h)  The practice of 'twisting' necessarily incurs the temptation to misrepresent because, being to the financial disadvantage of the policyholder, it is almost invariably accomplished by incomplete comparisons, by suppression of material facts or by active misrepresentation.  (Note: It is not claimed that relator has been guilty of these things.)

''(i)  The practice of encouraging policyholders to withdraw their cash reserve, if permitted and is accomplished on a large scale, would cause a serious 'run' on the assets of insurance companies; would constitute a concerted attack on invested reserves; and would tend to undermine confidence in well-established companies and in the institution of life insurance in general.

''(j)  The possession of cash reserves in existing policies constitutes a bulwark of safety to policyholders, a haven in time of financial stress; creates in the individual a sense of well being; and the accumulation and continuance of such reserves should be encouraged as a matter of public policy and the dissipation thereof should not be permitted by the practice of 'twisting.' ''

The respondent, State Superintendent of Insurance, then says that under Section 5904, Revised Statutes 1929, he is given power to refuse or revoke insurance brokers' licenses for cause, and ''that in-

ducing or attempting to induce a holder of a life insurance policy to surrender that policy and then take out new insurance in the company represented by the defendant, who advises the surrender, is good cause for refusing a broker's license even though the advice may be indirect and the element of misrepresentation may not be present, and under the facts in this case the respondent for the aforesaid reasons will refuse to issue to relator a broker's license, unless ordered to do so by this Honorable Court."

As we have said, the relator's demurrer challenges the sufficiency of this return in not stating facts or showing any valid reason for refusing to issue to relator a license as an insurance broker. The trial court sustained the demurrer and, we think, correctly so. We will say here, as we have said with reference to the advantages claimed by relator to accrue to policyholders in surrendering their high rate and high reserve policies for such reserve in cash and then taking out lower rate and lower reserve policies for a restricted term such as the "Modified Whole Life Policy" on the "Emancipator Plan," that we are not called on to pass on the respective advantages and disadvantages of doing so. The question here is whether the Superintendent of Insurance should use the strong arm of the State to prohibit insurance agents and insurance brokers, through and by whom practically all insurance policies are negotiated and issued, from participating in or practicing "twisting" as same is defined by the State Superintendent of Insurance, which is "inducing or attempting to induce the holder of a life insurance policy to surrender that policy and then take out new insurance in the company represented by the agent who advises the surrender. The advice may be direct or indirect. The element of misrepresentation may or may not be present." We do not believe that the statute under which the superintendent acts in issuing the licenses to insurance brokers clothes him with any such broad power and authority. In so holding we agree to all that is said in State ex rel. Mackey v. Hyde, 315 Mo. 681, 286 S. W. 363, holding that the word "may" does not mean "must" in the statute authorizing the Insurance Superintendent to issue licenses to insurance brokers, but that such statute is an exercise of the police power in regulating a business affected with a public interest and vests such officer with a reasonable discretion in granting or refusing licenses in order to enforce the statutory regulations applicable to insurance and insurance agents and brokers. It was not, however, intended to clothe the Superintendent of Insurance with power to make regulations or restrictions having the force of new statutes, but merely to adopt measures reasonably necessary to enforce and carry into effect the existing statutory regulations. As said in State ex rel. Mackey v. Hyde, supra, the statute clothes the Superintendent of Insurance with power to see to it that the licenses granted to brokers are not "made use of

to defeat the non-discriminatory provisions of the rate statute." The same may be said in regard to using the licenses issued to defeat the provisions of Section 5733, Revised Statutes 1929, in regard to making misrepresentations, issuing false estimates and circulars, and of Section 5773 relating to agents and others making false statements and misrepresentations in regard to policies. ▇▇ It should be noted, however, that the rule or regulation now in question against "twisting" is not made for the purpose of enforcing the statutes just mentioned as such statutes are directed against making misrepresentations, false statements, and other acts involving fraud and deceit, while this rule against twisting entirely disregards the element of misrepresentation, false statements, fraud or deceit. The offense of twisting is made to cover the mere act of a policyholder, at a broker's or agent's suggestion, surrendering his policy in one company and taking out a policy in another company, which, when not induced by fraud, deceit, misrepresentation or false statement, but solely on the merits of the policies, is a pure matter of business judgment and involves the right to contract. When shorn of every element of wrongdoing, it is difficult to see how the prevention of twisting of policies can be regarded as an exercise of the police power in protecting the morals, health, safety and general welfare of the public. If it is or becomes necessary to exercise the police power of the State in suppressing twisting of insurance policies when not accompanied with or induced by misrepresentation, fraud or deceit, the Legislature should act in the matter, and this it has not done. As held in Merchants' Exchange of St. Louis v. Knott, 212 Mo. 616, 643; 111 S. W. 565, there is a wide difference between the delegation of a police power to a commission or head of a department and its exercise by the Legislature itself.

It is not necessary for us to go so far as to say, as relator argues, that the prohibition of twisting without misrepresentation and not induced by fraud or deceit would be violative of the constitutional provisions guaranteeing to every citizen the equal protection of the laws, or the right of freedom of speech, and protecting him against being deprived of his property rights without due process of law. To so hold would mean that the Legislature could not prohibit insurance agents and brokers from participating in twisting of insurance policies, absent misrepresentation, fraud or deceit, for such constitutional limitations are binding on the legislative power as well as on the executive and judicial power. It will be time enough to examine that question when the Legislature acts.

We may also say that we find little, if any, force in the argument that practically all the insurance companies condemn and forbid their agents and representatives to engage in twisting policies. This merely means that such companies find it good business policy to cooperate with each other to this extent rather than engage in com-

petition of this character. Twisting policies means that one company seeks to build up its own business by tearing down and taking away the business of another, and companies might well agree to restrain from so doing and to expend all their efforts in obtaining new business. Such policy commends itself, though it may not always be for the best interests of the individual policyholder. "Competition," to an extent at least, "is the life of trade." At most, it is a matter of sound business policy and does not imperatively call for the State to exercise its authority in the matter as a police measure, and if it does it is for the Legislature to exercise the authority or delegate it in proper form and under proper conditions. We do not think that the statute in question, Section 5904, Revised Statutes 1929, does this.

Our conclusion is that the trial court properly sustained the demurrer to the defendant's return and ordered the peremptory writ to issue, and the judgment is affirmed. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by Sturgis, C., is adopted as the opinion of the court. All the judges concur.