## ALBRIGHT et al. v. FISHER et al.

### In Banc, June 18, 1901.

**Municipal Corporations:** ORDINANCE: INJUNCTION: DEPARTMENTS OF GOVERNMENT. Constitution, article 3, declares that the powers of the government shall be divided into the legislative, executive, and judicial departments, each of which shall be confined to a separate magistracy, and no person or collection of persons charged with powers properly belonging to one of these departments shall exercise any power properly belonging to the other, save in the instances permitted by the Constitution. *Held,* that the circuit court has no authority to entertain a suit to restrain the municipal assembly of a city from passing an ordinance giving a street railroad company a right of way in certain streets. (Overruling State ex rel. v. Meier, 143 Mo. 439; BRACE and GANTT, JJ., dissenting.)

### *Prohibition.*

RULE MADE ABSOLUTE.

*McKeighan & Watts, G. A. Finkelnburg* and *Dawson & Garvin* for plaintiffs.

It is beyond the jurisdiction of a circuit court to enjoin the consideration or passage of an ordinance by the municipal assembly of the city of St. Louis granting a right of way over certain streets of the city for street railway purposes, because the consideration and passage of such an ordinance constitute legislative acts, which a court has no power to supervise. State ex rel. v. Sup. Ct. Milwaukee, 105 Wis. 651; s. c., 48 L. R. A. 819; Des Moines Gas Co. v. City of Des Moines, 44 Iowa 505;

s. c., 24 Am. Rep. 756; New Orleans Water Works v. New Orleans, 164 U. S. 481; City of Chicago v. Evans, 24 Ill. 52; Railroad v. New Orleans, 39 La. An. 127; Dillon, Mun. Corp., sec. 308, note p. 387; 16 Am. and Eng. Ency. of Law (2 Ed.), 423; State ex rel. v. Bersch, 83 Mo. App. 657; State ex rel. v. Meier, 143 Mo. 445; State ex rel. v. Governor, 39 Mo. 388; State ex rel. v. Stone, 120 Mo. 433; Stevens v. St. Mary's School, 144 Ill. 351.

*Clinton Rowell, Joseph H. Zumbalen, Jos. S. Laurie, Jacob Klein* and *Warwick M. Hough* for defendants.

Injunction will not lie against the Legislature to prevent the passage of a bill, because it is a co-ordinate branch of government, entirely independent of the judiciary, and supreme in its department. This is not true of a municipal corporation, for, "the power delegated to a municipality is not, as to all subjects, absolute even within corporate limits. On the contrary, it is not only restricted by statute, but also subordinate to settled principles of law and equity, in view of which it is presumed to be delegated." Thus, while the courts have no power to declare an act of the Legislature void merely because it is unreasonable, they have such power to declare a municipal ordinance void, even when power over the subject-matter exists, if the manner of its exercise has been unreasonable and not in harmony with the general law of the land. City of Tarkio v. Cook, 120 Mo. 1; Corrigan v. Gage, 68 Mo. 541; Skinker v. Heman, 148 Mo. 349; Glasgow v. St. Louis, 107 Mo. 198; Knapp-Stout & Co. v. St. Louis, 153 Mo. 560.

SHERWOOD, J.—This litigation presents these features:

First, a temporary injunction granted by the defendant

judge, on the application of James M. Carpenter et al. against Edmund Bersch et al., all members of the municipal assembly of the city of St. Louis, including the presiding officers of both houses of said assembly, restraining such members in their official capacity from considering, passing or adopting, or taking any further action upon or in relation to, Council Bill No. 44 for an ordinance to be entitled as follows: "To authorize the St. Louis & Suburban Railway Company to extend its lines and to construct, maintain and operate its railway on, along and across certain streets, alleys, city blocks and public places in the city of St. Louis," etc., etc.

Second, a rule to show cause, granted by the chief justice of this court directed to Daniel D. Fisher, judge, etc., et al., commanding them to appear before this court and to show cause, if any they have, why a writ of prohibition should not issue against them, as prayed in the petition of plaintiffs herein.

Third, a return to the rule made by the respondent judge, asserting his jurisdiction to grant the injunction complained of, under and by virtue of the authority and discretion vested in him by the Constitution and laws of this State, and more particularly by section 3647, Revised Statutes 1899.

Fourth, a like return to such rule by Carpenter and other defendants, in which they assert among other things, that the rule *nisi* should be discharged, for the reason that, "under and by authority of an act of the General Assembly of this State entitled 'An Act prohibiting the city council or board of trustees of any incorporated city from granting the right to lay down railroad tracks in any street of the city, except upon the petition of owners representing more than one-half of so much of the frontage of the street as is sought to be used for such purposes,' approved April 29, 1899, and under and by virtue of an act of the General Assembly of this State, entitled 'An Act to revise and amend chapter 155 of the Revised Statutes

of Missouri, 1889, and amendatory acts thereof, entitled
"Street Railroads," ' approved June 19, 1899, the municipal
authorities of the city of St. Louis, and the municipal assembly
of the city, which these defendants say is composed of the
persons who are named in the petition in said cause of Carpen-
ter and others against Bersch and others as defendants, have
no power or authority to grant to any street railroad company
the right or franchise to construct, maintain or operate any
street railroad over, along or across any street within the city of
St. Louis, except upon the petition of the owners of the land
representing more than one-half of the frontage of that part of
such street sought to be used for street railroad purposes; and
when the street or parts thereof, that is sought to be so used,
shall be more than one mile in extent, the petition of landowners
shall not be valid unless the same is signed by more than one-
half of the persons owning property fronting on such street, for
each mile or fractional part of a mile of each street so intended
to be used, in the total length of such proposed street railroad,
and that such petition of such owners is thus made a condition
precedent to the exercise of such power.

"And these defendants say that they are the owners of the
property described in their petition fronting on Lawton avenue,
and that said property is used by them in the manner described
in their said petition, a copy of which is embodied in the peti-
tion of the plaintiffs in this proceeding, as well as in the pre-
liminary writ of prohibition herein.

"And these defendants further say that in and by the
Council Bill No. 44, mentioned in their said petition and in the
petition of the plaintiffs in this proceeding, it is proposed to give
and grant unto said company the right, license and franchise for
the period of fifty years to construct, maintain and operate a
street railway on Lawton avenue, along and in front of the prop-
erties of these defendants situated on said street, and thereby to

enter into a contract with said company, giving and granting to it such right, franchise and privilege for said period. That the said St. Louis and Suburban Railway Company is a street railway company in the city of St. Louis organized long before the passage and approval of the acts of the General Assembly above mentioned, and that said company has not now any right, license or franchise to construct, operate or maintain a street railway on said Lawton avenue. That said Lawton avenue is a public street and highway in the city of St. Louis, and was formerly known as Chestnut street in said city.

"And these defendants say that neither they, nor any of the other owners of property abutting upon and fronting on said Lawton avenue, have ever signed any petition to the municipal assembly of the city of St. Louis, or either branch thereof, for such street railway on said street," etc., etc.

To each of these returns, respectively, there were general demurrers filed, to the effect that neither of said returns stated facts sufficient to constitute any legal reason why the preliminary rule should not be made absolute.

These returns and the demurrers thereto, write down this question upon the record: Did the circuit court have jurisdiction to enjoin the municipal assembly of the city of St. Louis from enacting the proposed ordinance? The question thus propounded must have its answer in either a direct affirmance or direct denial of the existence of such judicial power; a power pure, simple and abstract, having no connection whatever with the incidents and consequences attendant on, or flowing from, the exercise, or non-exercise, of such power.

In order to determine whether such judicial power, to-wit, jurisdiction, exists in any particular instance, the initial step in the pathway of inquiry must be directed toward the fountain head of all authority, the fundamental law of this State, article 3 of which declares: "The powers of government shall be di-

vided into three distinct departments—the legislative, execu-
tive and judicial—each of which shall be confided to a separate
magistracy, and no person [or collection of persons], charged
with the exercise of powers properly belonging to one of those
departments, shall exercise any power properly belonging to
either of the others, except in the instances [in this Constitu-
tion] expressly directed or permitted."

The changes which have occurred in this article since the
Constitution of 1820 was adopted, have been bracketed on the
article just quoted, and as will be readily seen, serve to give
emphasis to its former provisions and prescriptions.

This charter of authority, as is apparent at a glance, care-
fully divides the powers of government into three distinct and
named departments; sedulously segregates each from the other;
confides each to a separate magistracy, and then not satisfied
with such strict demarcation of the boundaries of their respect-
ive jurisdictions, peremptorily forbids either of such depart-
ments from passing the prohibitory precincts thus ordained, by
the exercise of powers properly belonging to either of the others,
and then concludes by giving the sole exception to the unbend-
ing rule by saying: *"except in the instances in this Constitution
expressly directed or permitted."* So that, in determining in
any given case whatsoever, whether one of those departments
has broken the close of its neighbor by trespassing over the ap-
pointed governmental lines or corners, the only method of pro-
cedure, the only test, to ascertain the truth of the matter thus
in controversy, is to industriously examine the other portions of
the organic law to see whether or not such seeming trespass is in
reality not a trespass, by reason of the pregnant and predomin-
ant fact that it is by the Constitution *"expressly directed or per-
mitted."* Lacking such express direction or express permis-
sion, the act done must incontinently be condemned as unwar-
ranted by the Constitution; in short, a clear case of *clausum*

*fregit;* and of a trespasser *ab initio.* And it is obviously the
bounden duty of him who justifies the seeming trespass to point
out, to place his finger on, the very identical provision of the
Constitution on which he relies to support his plea of justifica-
tion; and unless this can be done, he stands defenseless before
the bar of the court.

In State ex rel. v. Stone, 120 Mo. 428, the issuance of an
alternative writ of mandamus was waived by the then Governor
of this State, in a proceeding instituted in this court to compel
that official to pay a certain attorney's fee for services rendered
this State, under a contract duly made with this State and duly
performed by such attorney; and for which an appropriation
had been duly made by the General Assembly. To the petition
alleging the facts aforesaid, treating it as an alternative writ,
the Governor demurred generally, which brought up, of course,
the sufficiency of the petition, which we held stated a cause of
action, and that its allegations stood confessed by the demurrer,
but notwithstanding this, we said that "the only question for de-
termination is, whether the respondent is amenable to the pro-
cess of this sort; in other words, whether this court has *jurisdic-
tion* to entertain this application made by relator." And there-
upon we adverted to and quoted article 3, above set forth, and
commenting on its provisions, remarked: "Conceding the
validity of any given law, the fact that the duties which it pre-
scribes are merely ministerial can not take them out of the do-
main of executive duties nor make them any the less those which
'properly belong' to the executive department of the government.
And should we by our process be able to compel the perform-
ance by the Governor of such duties, we would in effect and to
all intents and purposes be performing those duties ourselves;
for there can be no substantial distinction drawn between our
assumption of duties pertaining to another department of the
government, and our intervention resulting in the compulsory

performance of such duties; *qui facit per alium,* etc. . . . . .

"Abundant authority establishes the position here taken that mandamus will not issue to the Governor to compel the performance of any duty pertaining to his office, whether political or merely ministerial; whether commanded by the Constitution or by some law passed on the subject." Citing authorities, among them High on Extr. Leg. Rem. (2 Ed.), sec. 118, where after stating that there were some authorities to the contrary, that author observes: "Upon the other hand, it is held that under our structure of government, with its three distinct departments, executive, legislative and judicial, each department being wholly independent of the other, neither branch can properly interfere with the duties of the other, and that as to the nature of the duties required of the executive department by law, and as to its obligation to perform those duties, it is entirely independent of any control by the judiciary."

And also Wood, where on the same subject he says: "If the courts may interfere with the discharge of any ministerial duties of the executive department of the government they may with all, and we should have the singular spectacle of a government run by the courts, instead of the officers provided by the Constitution. Each department of the government is essentially and necessarily distinct from the others, and neither can lawfully trench upon or interfere with the powers of the other; and our safety, both as to National and State governments, is largely dependent upon the preservation of the distribution of power and authority made by the Constitution, and the laws made in pursuance thereof. If the Governor refuses or neglects to discharge his duties, exceeds his powers in flagrant cases, there is ample remedy by impeachment and removal from office. It is not believed that the courts have the power to discharge his duties for him, or to say what he shall or what he shall not do." [Wood on Mand., pp. 123, 124; See, also, Mer-

rill on Mandamus, sec. 97.]

That the municipal assembly of the city of St. Louis when engaged in the passage of an ordinance is engaged in the performance of a legislative function, and in doing so, is exercising a part of the lawmaking powers of this State, and, in so doing, constitutes part and parcel of the legislative department of this State, has been frequently announced by this court.

Thus, in Taylor v. Carondelet, 22 Mo. 105, Judge Scott said: "The Legislature delegated its legislative power over to the corporation, and the corporation, within the sphere of its delegated power, could act as authoritatively in relation to it as the Legislature. The lawmaking power, in fact, made the board of trustees a miniature general assembly, and gave their ordinances on this subject the force of laws passed by the Legislature of the State."

Thus, in St. Louis v. Foster, 52 Mo. loc. cit. 515, Wagner, J., when speaking of the acts of municipal assemblies when convened in their official capacity, said: "Their charters are their constitutions, which authorize councils to act, and a city council is a 'miniature general assembly, and their authorized ordinances have the force of laws passed by the Legislature of the State.' "

In State v. DeBar, 58 Mo. loc. cit. 397, Judge Lewis said: "The municipal ordinances and the State statutes are from a common source of authority. One class presents it in a delegated, and the other in a direct form, but it is the power of the State which speaks in both."

Like utterances respecting the legal status of these legislatures in miniature, are to be found in Railroad v. Railroad, 105 Mo. loc. cit. 575; Jackson v. Railroad, 118 Mo. loc. cit. 218, 219; Moore v. Cape Girardeau, 103 Mo. loc. cit. 476, and other cases.

Taking this established doctrine of this court as a basis and a premise, it must needs follow that when the municipal assem-

bly of the city of St. Louis is engaged in the performance of its legislative functions, it is quite beyond the power of the courts to interfere with the exercise of those functions *in any way or manner whatsoever* whether by enjoining the passage of an ordinance or by mandatorily compelling the presiding officer of either house *to make that an ordinance* which was not an ordinance theretofore, by appending his unwilling signature thereto. This conclusion is inevitably true while the decisions quoted from stand; and they will continue to stand until and unless you overthrow them by establishing that the municipal assembly of the city of St. Louis, indeed all other similar bodies, do not constitute part and parcel of the legislative department of this State. Inasmuch, therefore, as they do this, they and their presiding officers, for the latter's functions are also legislative (State ex rel. v. Mead, 71 Mo. loc. cit. 275), occupy the same plane, the same impregnable exemption from judicial attack as does the General Assembly of this State and its officers, when enacting laws for the whole State. You can not make fish of the one and fowl of the other. Nor can you in this instance, decry the municipal assembly of the city of St. Louis and thus place it outside the pale of constitutional protection from judicial interference, or rather judicial usurpation, by saying of it as was said of it in effect in State ex rel. v. Meier, 143 Mo. 439, that the office of the president of the council of the city of St. Louis, "*is the creature of delegated statutory power;* his power is measured by the terms of the charter, and nothing can be found in the nature of the office thus created that brings it within the principle announced in this case," referring to State v. Stone, supra. Inasmuch, however, as the charter of the city of St. Louis was authorized by section 20 of article 9 of the Constitution, and inasmuch as the city charter was the outgrowth of that constitutional authorization, and inasmuch as

Vol 164 mo—5

section 8 of article 3 of that charter creates the office of president of the council, it is not vividly apparent where and how "*delegated statutory* power" comes in. But if the office of the president of the council did in fact have a statutory origin, it is not immediately seen how such origin could alter the nature of the office he holds or subject him to compulsory processes, processes from which those "*above the salt*" on the public board, are altogether exempted. Article 3, aforesaid, neither makes nor intends any such distinction; and when the courts do it, it is done in the very teeth of the plainest of constitutional provisions. Article 3 does not say that the judicial department shall not interfere with the legislative department in its higher graded assemblies, or the officers of such grades, but may interfere with those of subordinate or inferior capacity and their officers, nor does it say that if the officer of such inferior subordinate legislative assemblies declines to perform some supposed *ministerial* duty, that there the judicial department may compel such performance; on the contrary thereof, its prohibitions are as broad, extensive and comprehensive as the outlying boundaries of the legislative department, the only exception being where the specific line of carefully drawn demarcation yields at the single point of *express direction or express permission*.

The opinion of Judge VALLIANT in Meier's case, supra, delivered on circuit in which he denied the peremptory writ, is singularly clear in its statement and cogent in its reasoning, and in which he points out with force and aptness the strongly resemblant features existing between Stone's case and that of Meier, and especially between the latter and that of Ex parte Echols, 39 Ala. 698. The learned judge, also, in the course of his opinion holds that the signing of a bill is a *legislative act,* and not a mere *ministerial act* remarking: "The duty of signing the bill affects an essential act in the progress of legislation. If its purpose were simply to identify the bill the law would

probably have devolved it on the secretary or clerk, whose signature usually attests documents, and then it would be merely a ministerial act.

"But the law has prescribed when and under what circumstances the bill should be signed, and by imposing that duty on the president of the council necessarily calls for the exercise of his judgment as to whether or not all the requirements of the law in its passage have been complied with. This raises the signing of the bill above a mere ministerial act and makes it an act of legislation."

It will be observed in Stone's case that the main point on which that case was made chiefly to turn (as shown in the above quotation, not noticed, however, in Meier's case), was that this court could not, by mandamus, enforce against the Governor even the performance of a mere *ministerial* duty because it *"properly belonged"* to the executive department of the government."

In State ex rel. v. Bolte, 151 Mo. 362, a mandamus was asked to compel the Lieutenant-Governor, as presiding officer of the Senate, to sign a bill which he had ruled had not passed the Senate, and it was held that the signing of a bill was not a mere perfunctory act, but one requiring the exercise of judgment and discretion and with which this court would not interfere, BURGESS, J., observing: "While it is the duty of the Supreme Court to construe laws enacted by the General Assembly, and, while it has the power to declare them valid or invalid as the case may be, it would be a gross usurpation of power for it to assume functions which belong exclusively to that body."

State ex rel. v. Meier has been necessarily adverted to, because it is the theory of this opinion as already developed, that no interference whatever of one department with another is tolerable under article 3 of our Constitution. The case just referred to, places restrictions and qualifications on this consti-

tutional prohibition, which we regard as wholly unwarranted, and we therefore hold that case should no longer be followed.

Of course, any language herein employed is not intended to convey the idea that courts can not interfere to prevent the execution or enforcement of ordinances *already passed.* [Dennison v. City, 95 Mo. 416; State v. Paterson, 34 N. J. 163; State v. Jersey City, Ib. 429; Baltimore v. Radecke, 49 Md. 217.]

Or to declare it invalid because unreasonable. [Corrigan v. Gage, 68 Mo. 541.]

Or to pronounce an ordinance invalid because of its being unconstitutional. [Ex parte Smith, 135 Mo. 223, and cas. cit.]

Or to hold a statute unconstitutional for a like reason. [Ex parte Lucas, 160 Mo. 218, and cas. cit.]

And courts, in the case of ordinances, have sometimes taken action to declare invalid ordinances passed through fraud and corruption, though they will not do so in regard to statutes. Courts when engaged in doing the acts mentioned, are not in the exercise of any powers only such as properly belong to the judicial department.

Under the views hereinbefore expressed, it has been deemed unnecessary to discuss authorities pro and con of the question whether a court on general principles, will intervene in cases of ordinances then on their passage or about to be passed and on the calendar for that purpose, since we regard our constitutional provisions conclusive against the exercise of any such supposed jurisdiction. And for this reason also it is that we must refrain from discussing the force and effect, if any, of the statute of 1899, pleaded in one of the returns of defendants; for this would be to enter on a discussion of the merits of this controversy, something we regard as wholly *dehors* the present record.

In reference to the provisions of section 3467, pleaded in the return of the learned defendant judge, it only needs to say that such provisions are inapplicable to matters forbidden by the fundamental law as previously quoted.

The premises considered, the rule *nisi* for a writ of prohibition will be made absolute. *Burgess, C. J.,* and *Robinson, Marshall* and *Valliant JJ.,* concur; *Brace, J.,* concurs in the result only; *Gantt, J.,* concurs in all except in overruling the case of State ex rel. v. Meier, and thinks this case can be distinguished from Meier's case.

### SEPARATE OPINION.

BRACE, J.—While I agree that the rule should be made absolute in this case, I do not agree to the opinion of the majority of the court criticising and overruling the case of the State ex rel. v. Meier, 143 Mo. 439, which I think was correctly decided, and is easily distinguishable from this case, as well as from the case of State ex rel. v. Stone, 120 Mo. 428.