STATE OF MISSOURI at the relation of JOHN C. ROTHRUM, Appellant,
v. A. L. DARBY, Director of Finance et al.—137 S. W. (2d) 532.

Division One, March 6, 1940.

1004

*Frederick E. Whitten* and *John H. Haley* for relator.

*Sam C. Blair* and *Marcy K. Brown, Jr.,* for respondents.

HYDE, C.—This is a proceeding in mandamus. Appellant sought to compel respondents to take action necessary to pay him amounts claimed to be due him for his salary as a motor driver of the Fire Fighting Division of the Fire Department of Kansas City. The total amount claimed was $1025. The court entered judgment that the peremptory writ be denied, that the alternative writ be quashed, and that appellant's petition be dismissed. This appeal is from that judgment and we have jurisdiction because of constitutional questions raised by both parties.

From July 9, 1912, and until June 8, 1937, appellant was a fireman of the Kansas City Fire Department. In 1930, he was a motor driver of the Division of Fire Fighting and his annual salary, as fixed by ordinance, No. 52820, adopted April 14, 1926, amended September 30, 1929, was $1920 or $160 per month, which was paid in bi-monthly payments. This ordinance was later amended by an ordinance adopted April 17, 1933, effective May 1, 1933, which reduced salaries of such motor drivers to $1680, or $140 per month. Pursuant to a plan of the City Manager, certain amounts were deducted from appellant's salary during several months of 1930 and of each year thereafter. Plaintiff's suit is to compel payment of such of these amounts as are not barred by the five-year statute of limitations, which were as follows: "November, 1932, $20.00; December 1, 1932, to December 31, 1932, inclusive, the sum of $40.00; January 1, 1933 to January 15, 1933, inclusive $20.00; January 16, 1933 to January 31, 1933, $40.00; February 1933, $80.00; March 1933, $80.00; April 1933, $80.00; September 1933, $35.00; October 1933, $35.00; November 1933, $35.00; December 1933, $35.00; January 1934, $35.00; February 1934, $35.00; March 1934, $35.00; April 1934, $70.00; November 1934, $35.00; December 1934, $35.00; January 1935, $35.00; February 1935, $35.00; March 1935, $35.00; April 1935, $35.00; January 1936, $35.00; February 1936, $35.00; March 1936, $35.00; April 1936, $35.00."

Appellant's contention is that these deductions were unlawfully made without any legal right to do so and that these amounts are due him from the city. The basis claimed for making these deductions was that appellant, and all other appointive officers and employees of the city, during the months in which they were made, signed a printed application blank in the following form:

"I hereby apply for leave of absence from my position . . . . . . . . . . for the period from . . . . . . . . . ., 193. . . ., to . . . . . . . . . ., 193. . . .,

inclusive, and I hereby agree that if this application is granted, such leave of absence shall be without pay, and the amount of compensation which would otherwise accrue to me for such period shall be remitted in full to Kansas City, Missouri; and it is further agreed that if this application is granted, any service rendered by me in whole or in part during all or any portion of said period shall be wholly voluntary and gratuitous and no compensation shall be paid me therefor.

"Dated .........., 193..... .................

"The above application is hereby accepted and leave of absence granted for period stated, without pay.

"Dated .........., 193.....

.................."

The acceptance of these applications were on each occasion duly signed by the department head and deductions were made in the next pay roll for the days stated therein. The number of days to be inserted and the months during which these applications should be made were determined by H. F. McElroy, the City Manager. He testified that "the fiscal year of the city starts May 1 of each year;" that property taxes (which go into the general revenue fund of the city) are due June 1 and penalties for non-payment start November 1; that the general revenue fund also receives income throughout the year from licenses, gasoline taxes, liquor taxes, and other designated sources; that estimates of cost of all requirements of various departments for the next fiscal year are made to him in February; that budget recommendations are made by him to the city council in March and April; and that by November 1 he knew the financial condition of the city, "what the revenue was of that year and the expenses that would have to be taken care of in the operation of the city." He further stated the property tax levy of the city for general purposes was "up to the constitutional limit and has been for thirty years;" that "in 1930 (before November) the city's financial condition required action to be taken to keep the city within its financial budget for that year;" and that "we discussed the matter with the mayor and the different directors, and we concluded the better way to do would be to ask the employees to take a voluntary vacation, which meant a voluntary cut in payrolls, or voluntary reduction in the amount of the payroll, and in that way, meet the situation." He further testified that "this was put into force and effect in November of that year, 1930;" that the City Counselor thought "this could be done legally providing, of course, the people would take the vacation or accept the cut in pay which amounted to practically voluntary;" that "the purpose of it was to reduce the cost of operating the city;" that this "plan has been followed in succeeding years" up to 1937; and that the alternatives were "either have to make a cut in pay, or cut off or discharge some men or dispense with some valuable services

to the people, (or) increase the tax burden on the people,'' which would have required some method other than raising the tax levy.

He testified further, as follows:

''Q. Now had all of these men, including Mr. Rothrum, accepted the terms of this agreement, and gone on vacation, what were you going to do with the fire department to maintain it, keep it open? A. Well, that never occurred, and it never was necessary to consider that. Q. Then it was not the intention of yourself and the city council that these men ever take a leave of absence as set out in these slips? A. Well, I don't know whether those slips were just exactly what they say they are.''

It was shown by other evidence that appellant, and other members of the Fire Department, were never notified that any leave of absence purported to have been applied for, under this plan, was granted, and it was admitted that during the months, in which pay deductions were made, on the basis of such leaves of absence, appellant ''continuously, without interruption, faithfully and fully discharged all the duties of a motor driver in the fire fighting division of the Fire Department of said city.'' It was also shown that, if appellant, or any other fireman, did actually desire to be absent during the times specified in the City Manager's leave of absence applications, or any part thereof, it was necessary for him to make another and different application to the Captain of his company, just the same as on any other occasion. The Captain, if he agreed, would get the approval of the district Chief, who could approve a leave of not more than three days. If such an application was granted, the fireman was required to have a substitute ready to take his place, and the pay of this substitute was likewise deducted from the fireman's pay in the next payroll.

It is obvious that, as the City Manager admitted, the leave of absence agreements were not ''what they say they are.'' It is apparent that no such agreement, as stated therein (leave of absence without pay) was ever made or intended to be made by either party thereto. Clearly the actual arrangement intended was work without pay, not vacation without pay. It is, therefore, unnecessary to pass upon the legality or effect of an agreement for a leave of absence without pay as none was ever made.

The real question is validity of an agreement, for deductions from pay fixed by ordinance (without any change by ordinance), made between executive officers (the City Manager and department directors) and the other appointed city officers or employees; considering such an agreement either to be implied from the terms of the leave of absence agreements or from acceptance of pay as shown in the payrolls or as an oral contract. Appellant contends that such an agreement was void; that to withhold and refuse to pay part of his salary fixed by ordinance was unlawful and arbitrary; and that

he was thereby deprived of his property without due process of law, in violation of Section 30, Article II of the Constitution of Missouri and the Fourteenth Amendment to the Constitution of the United States.

The majority rule is that such an agreement is void, on grounds of public policy. [For cases see 70 A. L. R. 975 note; 118 A. L. R. 1458 note; see also Orthwein v. St. Louis, 265 Mo. 556, 178 S. W. 87, and cases cited; 46 C. J. 1027, sec. 275; 43 C. J. 702, sec. 1173; 19 R. C. L. 920, sec. 220; 22 R. C. L. 537-541, secs. 234-239; 2 McQuillin, Municipal Corporations 330, sec. 542; Throop's Public Officers, secs. 52 and 456; Mechem on Public Officers, sec. 377.] Cases showing the minority view, upon which respondents' rely will also be found in these A. L. R. notes. Most of these cases were ruled on the theory of either ''donation'' or ''estoppel'' hereinafter discussed; but, in some, compensation was changed by authorities having power to do so. Some grounds of public policy involved were recently stated by a Texas appellate court, as follows:

''It is to be presumed that the Legislature, in fixing the salary to be paid to those who filled the various public offices of this state, did so with due regard to the nature of the service and the character of the individual needed to fill the office, and the type of officer that could be obtained for the salary offered. If a candidate for public office is permitted to obtain appointment or election by a promise to serve for less than the amount fixed by the Legislature, *or if, after having obtained appointment or election, he is permitted to more securely entrench himself in office by such a promise* and thus bring about his reappointment or re-election, such practice will ultimately result in the virtual auctioning off of official positions to the lowest bidder, and the obtaining of the least efficient employees to fill the positions. Those capable of earning the salary fixed by the statute, and of the type contemplated by the Legislature, will be eliminated by such competitive bidding, so that none but the inefficient will be available for selection to fill the offices. Official morality and public policy alike prohibit the undermining of the public service by *permitting officers to thus make merchandise of their official services.* Such promises by public officials have been condemned as contrary to public policy, not only by the Supreme Court of this State, but by the federal courts, and the Courts of Appeals of almost every other state in the Union.'' (Our italics.) [Crutcher v. Johnson County (Tex.), 79 S. W. (2d) 932.]

An even more vital ground is, that public office, and compensation therefor, is not and must not become a matter of contract. [Mechem on Public Officers, secs. 463 and 855.] Public offices and positions belong to the people and not to officers upon whom they confer appointive power. [22 R. C. L. 377-379, secs. 9-11.] The qualifications, tenure, and compensation thereof must be determined

1012

by the people or the people will lose control of their government. This must be done by the representatives the people have authorized to act for them, unless the people themselves have determined these matters by writing them into the Constitution. If the people have not thus themselves determined them, then under our Constitution and theory of government, these are legislative powers. [Merchants' Exchants' Exchange of St. Louis v. Knott, 212 Mo. 616, 111 S. W. 565; Throop's Public Officers, secs. 19, and 443-444.] ■ It is fundamental, under our form of government, that "the powers of government shall be divided into three distinct departments . . . each of which shall be confided to a separate magistracy;" that "no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others;" so that we will have a government of laws and not a government of men. [Art. III, Const. of Mo.] A government of laws means a government in which laws, authorized to be made by the legislative branch, are equally binding upon all officers of the executive and judicial branches as completely as they are upon all other citizens. Otherwise, the ultimate result would be a government of men; rule by men, who temporarily obtain authority of office, by whatever whim, notion or caprice at any time occurred to them. This would surely bring about the collapse of free institutions and end government by the people. As taught by an ancient Arab proverb, the sure way to keep the camel out of the tent is to prevent him from putting his nose in the doorway. Complexities of government devised to meet new problems arising from modern urban and industrial civilization, affording public officers greater opportunities for abuse of power, make the enforcement of these fundamental principles more necessary then ever. Conditions and events in other great nations point to a warning so plain that he who runs may read. The opportunities for public officials to entrench themselves in office, by means inconsistent with the public welfare, in the manner commented upon by the Texas court, and likewise by oppressing and laying tribute upon their appointees, would be limitless beyond imagination in scope, if courts upheld the contract theory of dealing with subordinates whom they are authorized to appoint. Our criminal statutes against sale or purchase of office (Secs. 3931, 3936, 3939, 3940, and Sec. 3942, R. S. 1929, 4 Mo. Stat. Ann. 2757, 2759-60) are a clear declaration of the public policy of this State against the contract theory. Obviously, the use of such methods to *keep* in office is as much against the public interest as is their use to *get in* office.

■ In State ex rel. Kenney v. Remmers, 340 Mo. 126, 101 S. W. (2d) 70, a patrolman was discharged by the St. Louis Police Board because he employed counsel "to restrain them from asking him to give ten per cent of his salary toward unemployment relief." This

court held that a regulation of the Police Board denying the right of counsel to a patrolman unless permission was first given by the board was void because beyond the board's power. We said that, although the Legislature had given the board authority to make necessary rules and regulations, such a rule was so unreasonable and arbitrary as to be "transcendent of due bounds of legislative power, irrespective of constitutional provisions state or national." Therefore, we held that the dismissal of the patrolman, for violation of this regulation, was void. Certainly our fundamental laws do not support the right of one appointed executive officer to fix compensation of all other appointive officers by agreements with them in disregard of the action of the body exercising legislative power. If he could fix them lower by agreement, why could he not also thus fix them higher? We rule that this attempt of the City Manager to fix the compensation of all appointive City officers and employees was an arbitrary exercise of power, transcendent of due bounds of executive power and void.

Nor is any such authority given, or purported to be given, to any executive officer by the charter of Kansas City. Under the Constitution of this State, the Legislature, in the exercise of its general legislative power, may grant to municipalities authority to exercise powers properly belonging to the legislative department of the State. [Sluder v. St. Louis Transit Co., 189 Mo. 107, 88 S. W. 648; State ex rel. North & South Railroad Co. v. Meier, 143 Mo. 439, 45 S. W. 306, overruled on other grounds in Albright v. Fisher, 164 Mo. 56, 64 S. W. 106; Moore v. Cape Girardeau, 103 Mo. 470, 15 S. W. 755; State ex rel. Abel v. Gates, 190 Mo. 540, 89 S. W. 881; Stegmann v. Weeke, 279 Mo. 140, 214 S. W. 137; Kansas City v. J. I. Case Threshing Machine Co., 337 Mo. 913, 87 S. W. (2d) 195.] Section 7 of Article IX of our Constitution directs the Legislature to "provide, by general laws, for the organization and classification of cities and towns." The Constitution, by Section 16 of Article IX, directly grants legislative powers by which authority "any city having a population of more than one hundred thousand inhabitants may frame and adopt a charter for its own government, *consistent with and subject to the Constitution and laws of the State*." The italicized clause means that inconsistent charter provisions or ordinances, concerning the exercise of governmental functions, are void. [See Kansas City v. J. I. Case Threshing Machine Co., supra.] ■ Exercising this authority, Kansas City adopted a new charter in 1925. Section 61, of Article 2, of this Charter states that "the powers of the city, except as otherwise provided in this charter, shall be vested in a council." There is no exception as to legislative powers and such powers were thereby vested in the council pursuant to and consistent with the constitutional plan of government. The authority and duties of the City Manager, described as "the chief administrative officer of the city" are set out in Article III, Sections 20-24 and 27-28. They include no legislative

powers. (The same is true of department directors, see Secs. 24-27,. Art. III.) Moreover, Section 470, Article 20, provides that "the salary or compensation of officers and employees of the city shall be fixed by ordinances except as otherwise expressly provided in this. charter." (Compensation of elective officers is fixed by the charter, see Secs. 6 and 11, Art. II.) Likewise, Section 122, Article 5, provides that "the council shall by ordinances establish a schedule of compensation for officers and employees in the classified service, which shall provide uniform compensation for like service." (The classified service included appellant and all positions not listed as unclassified, limited to elective officers, heads of departments, etc.) Pursuant to these directions the council did fix compensation of all officers and employees, even to daily and hourly rates for common unskilled laborers in the Park Department, Water Department, and Public Works Department. [Ordinance No. 52820, Art. 19, Secs. 130-148.] If the income of the city would not pay the salaries fixed, it was the duty of the council to revise them. Nowhere in the charter is any such authority given the City Manager; and we hold that the council could not confer such powers upon him either by mere failure to act, by complete abdication of these functions, or even by attempting to delegate them. [See Cavanaugh v. Gerk, 313 Mo. 375, 280 S. W. 51, and cases cited.] Respondents urge the necessity brought about by the depression, but the depression did not prevent the council from acting to revise salaries to fit income. The council finally did thus change salaries and the matter of when such action should be taken was for it to decide.

■ Respondents argue that the rule of public policy, against the contract theory, should not apply to appellant because a fireman is only an employee and not a public officer. There has been some difference of opinion about the status of a fireman. [See note 36 L. R. A. (N. S.) 884; see also 2 McQuillin, Municipal Corporations, 63, sec. 437.] The Kentucky Court of Appeals, in Schmitt v. Dooling, 140 S. W. 197, 36 L. R. A. (N. S.) 881, held that a fireman was a public officer, within the rule that a public officer cannot assign his salary before it is due, for reasons that are certainly applicable here. [See also Bishop v. City of Omaha (Neb.), 264 N. W. 447.] It is well settled by our decisions that, in operating a fire department a city is exercising a governmental function. [Richardson v. City of Hannibal, 330 Mo. 398, 50 S. W. (2d) 648.] Moreover, the Kansas City Charter provides that "the Fire Chief, or any of his assistants in charge of any fire, shall have the same police powers at such fires as the Chief of Police." [As to tests of public officers see State ex rel. Pickett v. Truman, 333 Mo. 1018, 64 S. W. (2d) 105.] However, we rule that respondents' contention is answered by the specific provisions of the charter above mentioned, and others which place all positions in the classified service (except perhaps unskilled day la-

borers) on the same basis, and require the council to fix their compensation.

■ Likewise, we must overrule respondents' contention that appellant was not a public officer, and was subject to the contract theory of compensation, because his appointment was not for a fixed term, but "at will," and subject to "be removed or discharged at discretion, without notice." [Sec. 46, Art. 9, Ordinance No. 52820.] Under respondents' contention, the City Manager would not be a public officer, since he serves "during the pleasure of the council." [Sec. 20, Art. 3, Kansas City Charter.] Nor would any of the directors of departments, appointed by the City Manager and subject to "be removed by him at any time." [Sec. 21, Art. 3 of Charter.] The answer is that tenure "at will" of an executive officer does not mean compensation according to his will, especially when the charter specifically provides otherwise.

■ Respondents also rely upon laches, waiver, and estoppel. As to these contentions, we follow the ruling of the Supreme Court of the United States, in Glavey v. The United States, 182 U. S. 595, 21 Sup. Ct. 891, 45 L. Ed. 1247, for the reasons stated therein, as follows:

" 'If public policy prohibit such a bargain in advance, it would seem that a court should be astute not to give effect to such illegal contract by indirection, as by spelling out a waiver or estoppel.' If it were held otherwise, the result would be that the heads of executive departments could provide, in respect of all offices with fixed salaries attached and which they could fill by appointments, that the incumbents should not have the compensation established by Congress, but should perform the service connected with their respective positions for such compensation as the head of a department, under all the circumstances, deemed to be fair and adequate. In this way the subject of salaries for public officers would be under the control of the executive department of the government. Public policy forbids the recognition of any such power as belonging to the head of an executive department."

Moreover, if an officer receives more compensation than he is allowed by statute, the State or proper subdivision thereof can recover it from him. [Nodaway County v. Kidder, 344 Mo. 795, 129 S. W. (2d) 857.] It is a poor rule that does not work both ways. As this court said in State ex rel. Moss v. Hamilton, 303 Mo. 302, 260 S. W. 466, "the partial payment of a legal obligation is not payment in full, and does not discharge the debt;" and failure to claim the balance at the time did not cause "county through respondents to act to their detriment or to change its position to its detriment." [See also Whalen v. Buchanan County, 342 Mo. 33, 111 S. W. (2d) 177; State ex rel. Whalen v. Player, 280 Mo. 496, 218 S. W. 859.] Here the city had no right to assume that it had discharged its obligations for salaries be-

cause it had made partial payment. As hereinafter shown, city employees protested against the action of the City Manager through committees, which they no doubt considered a more expedient method under the circumstances than protesting individually. We, therefore, overrule respondents' contention based on laches, waiver and estoppel.

Respondents further contend that the agreements, signed by appellant, "constitute a legal donation of that part of his salary and services to the city." A donation according to Webster's International Dictionary, is a gift, a "voluntary alienation of property" or "gratuitous transfer of property." "Donate" means "to give gratuitously or without any consideration." [19 C. J. 444.] The City Manager and other executive officers said the plan was to be "entirely voluntary on the part of the employee." Nevertheless, the City Manager also said that it "amounted to practically voluntary;" that "this method would not have been adopted if I had thought there would be concerted action to set them aside;" that "there was a concerted action in 1933 on the part of a body of city employees, or committee representing city employees, concerning an increase of their salaries or a return of their salaries back to what they had been before they were cut;" and that "when there was an objection to it, then I resorted to another method of reducing—by ordinance." The secretary to the Director of the Fire Department (respondents' witness) testified each department would be notified that the·leave of absence slips "were ready at the auditor's office and to take them up and distribute them;" that "they were brought into the Chief's office and turned over to the Chief for distribution among the various department companies;" and that "the only instructions were that they were to be distributed and the members were to sign them voluntarily."

Appellant's Captain (also respondents' witness) testified, as follows:

"Rothrum never objected to signing any of these that I heard of. He never made any protest to me at all, or in my presence. We all knew we had to sign them. We were supposed to sign them. Q. Oh, you were supposed to sign them. Now, you say you all knew they had to be signed. Now, what made you know they had to be signed? A. Well, that was the order that we got, that we had to have a reduction in salaries. Q. I see. And you were signing them, because of the orders from above. That is the way that the things had to be done, that you had to sign them? A. Yes. Q. And where did those orders come from, Captain Becker? A. Why, the district Chief left them around, and left the cards. All we heard, there was going to be a reduction in salary. Q. As a matter of fact, you, nor any of the men in your company were asked whether you wanted to do it or not,

were you? A. No. Q. You were just told that that was what was expected? A. Yes."

One assistant city auditor (also respondents' witness) testified, as follows:

"Q. Your salary was cut? A. That is right. Q. You enjoyed it, didn't you, each year? A. Well, I haven't squawked yet. Q. You haven't squawked yet, but you felt like it lots of times, didn't you? A. Well— Q. (Interrupting) And the reason you haven't is because you want your job down there, don't you? A. That is right."

The Director of the Fire Department, called by appellant, testified:

"Just after these slips were first distributed to the men, several of the men inquired whether they were to sign them or not. . . . They would inquire whether or not there was any way to keep from signing these slips. I would tell them that it was the wishes of the administration that those slips be signed; that the only manner in which they felt they could retrench, and if they would press me as to what they should do individually, I would tell them, 'Well, I am going to sign mine. You do as you please with yours. It is your job and it is your money, and you will have to use your own judgment.' . . . (The City Manager) told me when these were to be sent around that no one was to be threatened with his job if he failed to sign them and he said it was to be a voluntary matter on the part of the persons who signed them. It was to be so understood and he directed me to see that that was the information brought out. . . . Committees came to see me and they protested against the pay cuts. They didn't like it. I explained the reasons for it. After that the committees left and the slips were sent out and they were all signed by the various members of the department."

Appellant testified that, on several occasions, as a member of the fireman's organization, he was on "committees that protested the cuts to the Director of the Fire Department," and "interviewed the City Manager along the same lines;" that "the City Manager told our whole committee at the time that the city was facing decreased revenues and increased expenses and it would not have enough money to pay everybody their full salaries for the full year and still carry on the duties and services that the city was supposed to give the public, but we didn't agree with the City Manager;" that "these slips had come through the same medium and through the same channels that other calls had come to the members of the fire department in relation to campaign contributions and assessments;" and that "I knew several men that had been discharged from the fire department for their failure to comply with the campaign orders that had come through this medium, and naturally, when the slips came that way I formed the conclusion, from their experience, that I would suffer the same fate." Another fireman, who was a member of the committees that protested to the City Manager testified that "the City

Manager made a remark there one time that one man didn't take a cut and he was not working for the city now." In April, 1937, appellant was reduced to a second grade fireman. He said this was because of "activities in the fireman's organization."

It seems clear, from respondents' own evidence as well as from other testimony set out, that the amount of these alleged donations, and the times when they should be made, were fixed by the City Manager; that they were on the same basis as campaign contributions, commonly known as the "lug", enforceable in the same way; and that it was well understood that the men should make them "*or else.*" It was wholly unnecessary to go into details about the alternative. It was, of course, "entirely voluntary" with them to choose between "cut" in pay or place on the payroll. Whatever may be the proper nomenclature of these transactions, we rule that they do not come within the legal classification of "donation" or "gift." If levies under such circumstances were upheld on the "donation" theory, the next step might well be that some officer would compel his appointees to "donate" to him, either in consideration of the appointment or to remain in office. [See Throop's Public Officers, secs. 50-55, and 578-580; Mechem on Public Officers, secs. 370-372; 22 R. C. L. 538-541, secs. 236 and 239.] This "donation" theory violates the same considerations of public policy as does the "contract" theory. Salaries of public officers should be openly fixed, after open discussion, in the proper legislative tribunal.

Respondents' final contention is thus stated:

"There is another insuperable obstacle to the recovery by relator in this case. Section 12, Article X, of the Constitution of Missouri, provides as follows: 'No . . . city . . . shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the consent of two-thirds of the voters thereof voting on such proposition, at an election to be held for that purpose. . . .' Two objects were in view in the enactment of this constitutional section; one object was to limit the rates of taxation for raising the annual revenue required for local purposes, and the other was to limit the power to incur indebtedness beyond the annual income and revenue provided for in each year. . . . Under the pleadings in this case it stands admitted that had the method followed in this case to keep the city within its income for the year not been followed, that obligations largely in excess of the income for each fiscal year would have been incurred. The only alternative to this was the voluntary reduction of salaries by the employees of the city so that all might work and still the operation of the city within the constitutional provisions could be followed."

It is true that the record shows that Kansas City had levied full amount authorized by the Constitution for general municipal pur-

poses. It is also admitted that if all salaries as fixed by ordinance had been paid in full, *then with all other amounts that were spent,* during the years of 1930 to 1936 inclusive, there would have been a deficit each year, between actual receipts and disbursements, annually averaging $542,642.99. However, respondents' showing as to income and amount of salaries was, as follows:

| Fiscal year ending April 30th | Total General Fund Receipts | Amount Necessary to pay all Salaries in full as fixed by Ordinance |
|---|---|---|
| 1930 | $6,755,469.00 | $4,586,350.00 |
| 1931 | 6,633,161.00 | 4,522,934.00 |
| 1932 | 6,068,047.00 | 4,357,694.00 |
| 1933 | 5,560,718.00 | 3,930,060.00 |
| 1934 | 6,250,762.00 | 4,352,148.00 |
| 1935 | 6,441,012.00 | 4,221,937.50 |
| 1936 | 6,440,820.00 | 4,429,249.50 |

It was also shown that the total of delinquent taxes during these seven years was $3,795,352.84, while the total amount of salaries withheld (difference between amounts fixed by ordinance and amounts paid) during these years was $3,798,498. Respondents' evidence further showed that the number of ''employees on the general fund payroll'' in 1930 was 2834, and that by 1936 this number had increased to 3212. They showed that 341 of this increase (from 663 to 1004) was in the health department, which in the same period increased total expenditures over 1930 by $270,239.00; that there were increased expenditures in other departments; and that new departments were added, such as liquor control and municipal auditorium. However, there was no showing as to when any obligations were incurred during any of those years, but only the total amount spent. Neither was there any attempt to show where *all* spent, over amounts paid on salaries, went to in any year. This is far from showing that ''the only alternative'' to violation of this constitutional provision ''was the voluntary reduction of salaries by the employees of the city.'' Certainly, this was not proof that it was illegal and unconstitutional to pay the salaries fixed by ordinance. In any event, the charter placed upon the council, and not on the City Manager (who could only recommend), the duty of fixing salaries and authorizing other expenditures on a basis that would come within the city's revenue.

Showing that a deficit between receipts and disbursements would exist at the end of a fiscal year, because taxes levied and payable during the year became delinquent and were not collected, does not show a violation of Section 12, Article X, of our Constitution for two reasons, recently stated by this court in Clarence Special School District v. School District No. 67, 341 Mo. 178, 107 S. W. (2d) 5, as follows:

First: '' 'Under this section (Sec. 12, Art. 10) . . . (the

city) might anticipate the revenue collected, *and to be collected,* for any given year, and contract debts for ordinary current expenses, which would be binding . . . *to the extent of the revenue provided for that year,* but not in excess of it.' (Our italics.) Failure to collect during any year all taxes levied therefor does not invalidate debts which were within the amount levied when contracted. [Trask v. Livingston County, supra; Book v. Earl, 87 Mo. 246; State ex rel. Clark County v. Hackmann, supra; Watson v. Kerr, supra; as to teacher's fund see Tate v. School District, 324 Mo. 477, 23 S. W. (2d) 1013, 70 A. L. R. 771.]''

Second: '' 'The only period which can be considered (under the constitutional limitation upon the right to incur debts) is the calendar year;' and 'the Legislature could not make anything but the calendar year the basis upon which to consider the right to issue bonds, or contract debts,' namely, 'A year beginning January 1st and ending December 31st.' [Union Trust & Savings Bank v. City of Sedalia, 300 Mo. 399, 254 S. W. 28, 32, and cases cited; see, also, Dennig v. Swift & Co., 339 Mo. 604, 98 S. W. (2d) 659.] Statutes making the school year begin on the first day of July of each year and end on the 30th day of June of the next succeeding year (or creating a city's fiscal year), certainly do not change this provision of the Constitution. There is no evidence in this record to show that the defendant became indebted, in any calendar year which could be involved herein, in excess of 'the income and revenue provided for such year.' ''

The judgment is reversed and the cause remanded with directions to enter judgment granting the peremptory writ of mandamus. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.

ON MOTION FOR REHEARING AND TO TRANSFER TO COURT EN BANC.

HYDE, C.— Respondents' motion seeks either a rehearing in Division or a transfer to the Court en Banc. As a ground for transfer, respondents suggest that a federal question is involved. However, we decided the case under the provisions of our state Constitution. Respondents, also as grounds for their motion, reargue the issues of public policy, waiver and estoppel. As to these matters, we adhere to the rulings made in our opinion for the reasons therein stated. Respondents also argue the question of laches (which we note was not pleaded by respondents in their return), and to a considerable degree this is stated as it might apply to a mandamus action under present conditions. Conceding that officers of the city would be barred by the defense of laches from maintaining a man-

damus proceeding in 1940, for the years herein involved, this issue would have to be decided in this case (if it had been pleaded) upon the situation that existed in 1937. At that time, relator was the only one to then seek such a remedy so far as this record shows, and (taking into consideration the matter of duress) there is nothing to indicate he did not commence this action as soon as he knew of his rights and learned the facts upon which they were based.

Respondents, as further grounds for their motion, seek to raise the question of whether "there *are* unincumbered funds available for the payment of this claim." They say that, in order to state a cause of action, it was essential for relator to plead the availability of such funds; and that, if there are no such funds, the result reached orders an act to be done that would actually be in violation of the city charter (Sec. 93, Art. 4) and the State Constitution (Sec. 12, Art. X), because "any unpaid salary due relator for the years 1932 to 1936 could lawfully and constitutionally be paid only out of the income and revenue of those years or from any surplus revenue in any succeeding year." Respondents admit that no such point as to pleading was made in the briefs.

Of course, it is well settled that when an attack is made on a pleading, at such a late stage and after no such assignment of error was timely made, it should be given the benefit of every reasonable inference, intendment and implication arising from a liberal construction. [Morrow v. Missouri Gas & Electric Service Co., 315 Mo. 367, 286 S. W. 106; Brock v. M. & O. Railway Co., 330 Mo. 918, 51 S. W. (2d) 100; Hawkins v. Paeben, 332 Mo. 479, 58 S. W. (2d) 437.] Looking to the pleadings herein, we find that relator alleged the existence of the charter provision cited by respondents (Sec. 93, Art. 4) prohibiting the Director of Finance from drawing a warrant "for which no appropriation has been made, or funds collected especially therefor, etc.;" and further alleged that "it was and is the duty of the respondents to pay to relator the sum of One Hundred and Sixty Dollars ($160) for each of the aforesaid months as salary for his services to Kansas City as aforesaid, but that respondents and each of them, wholly disregarded the duties enjoined upon them by the aforesaid statutes of the State of Missouri and charter and ordinances of Kansas City failed and neglected" to pay relator certain stated sums. Under this statement, the duty could only exist with funds available for payment. The same allegations were made as to amounts withheld after relator's salary was reduced to $140.00 per month by the 1933 ordinance. Considering respondents' pleadings and evidence, hereinafter referred to, we hold these allegations to be sufficient as against an attack at this stage, under the rule established by the cases hereinabove cited. [See also Hasty v. Marengo County Bank (Ala.), 89 So. 433; 18 R. C. L. 227, sec. 151; State ex rel. Fooshe v. Burley (S. C.), 61 S. E. 255, 16 L. R. A. (N. S.) 266.]

Respondents' return to these allegations was that "they deny that by reason of the aforesaid statute of Missouri, charter and ordinances of Kansas City, Missouri, it was and is the duty of the respondents to pay to relator the sum of One Hundred and Sixty Dollars ($160) for each of the aforesaid months as salary for his services to Kansas City as aforesaid and deny that respondents and each of them wholly disregarded the duties enjoined upon them by the aforesaid statute of the State of Missouri, and charter and ordinances of Kansas City;" and (after same allegations concerning the period during which relator's salary was $140 per month) that "they admit that relator has made demand on respondents that they fulfill, perform and discharge their duties as aforesaid and pay to your relator the said sums of money, but respondents have failed and refused so to do, but deny that there was any legal obligation upon respondents so to do." Respondents raised no different issues as between the two periods of different ordinance pay rates.

Respondents' return then stated the issue of lack of funds, upon which they relied at the trial, as follows:

"Respondents further state that *during the last five months of said fiscal years* during which relator complains of reduction in his salary that *there was not sufficient funds* and revenue collected and in the treasury of Kansas City to pay the necessary operating expenses of Kansas City, including the full amount of the salaries of all employees of Kansas City as called for by the salary schedule ordinance, and that had respondents paid the full amount of salaries as provided in the salary schedule to all the employees of Kansas City, including the relator, the respondents, Kansas City and its officers charged with the administration thereof, would thereby have been compelled to violate the Charter of Kansas City and particularly the budget provisions thereof in Article IV, Sections 85 and 99, inclusive, prohibiting said officers from incurring obligations and from drawing warrants on the treasury of Kansas City unless funds were therein unincumbered and available for the payment thereof, and also the limitations of Section 12 of Article X of the Constitution."

Relator's reply specifically denied that insufficient revenue made it necessary to withhold salaries during the times mentioned. Thus it is apparent that respondents' pleadings, instead of denying that funds were ever available or specifically stating that funds were not available in 1937, made the primary issue of whether "there was any legal obligation upon respondents" to pay relator, for each of the months he worked, the salary fixed by ordinance. As to availability of funds for payment, the return only alleged that they were not available "during the last five months of each of said fiscal years during which relator complains of reduction in his salary." This is by no means a denial that there were no funds applicable to the payment of relator's salary claim at other times during the cal-

endar year or when he made demand in 1937. [State ex rel. Wheeler v. Adams, 161 Mo. 349, 61 S. W. 894; Commonwealth v. Tice (Penn.), 116 Atl. 316.] The right to mandamus has been upheld in cases where properly applicable funds have been illegally diverted to some other use after demand for payment. [See note 98 A. L. R. 457, and State ex rel. Lane v. Craig, 69 Mo. 565.]

At the beginning of the trial, respondents put on evidence of the financial condition of the city. This showed that delinquent taxes (real, personal and merchants) for the period (1932-1936) covered by this action, amounted to more than $2,750,000, and that this was substantially the same amount as the total of all salaries withheld during that period. We know that the Legislature during this period provided for the payment of delinquent taxes of these years without penalty (Laws 1933, p. 423, Laws 1935, p. 408, Laws 1937, p. 572) and it is in the record that there were collections of delinquent taxes. Respondents' evidence mainly dealt with total amounts and did not go into details as to specific funds. Their evidence showed that in each successive year after 1933, until 1936 (all but $60 of the amount relator seeks to be paid accrued during or after 1933) the total amount of revenue received by the city increased over the previous year's receipts. (Increase for 1935 over 1933 was about $880,000 and 1936 receipts were substantially the same as 1935.) It also shows that during the years involved the total number of persons on the city payroll was materially increased (1932-2828; 1933-3041; 1936-3212); that the number in the Fire Department was increased, 1933-1936, about 9 per cent (1933-512; 1936-558); and that the Fire Department appropriation was increased, 1933-1936, about 18%. (1933-$744,351.82; 1936-$882,123.95). This is far from showing that the city was in such great financial distress that the salaries fixed by its 1933 ordinance (and the time prior thereto for which relator claimed) could not be paid or that there were no funds available in 1937 to pay relator's claim. Certainly, we cannot assume, on the basis of the facts in this record, that respondents are unable to comply with the order of the writ or will fail to do so. [See Lolordo v. Lacy, 337 Mo. 1097, l. c. 1110, 88 S. W. (2d) 353, l. c. 360.] Cases cannot be decided on appeal upon a state of facts not shown by the evidence offered at the trial, or upon defenses not presented in the trial court.

Respondents' motion is overruled. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.